## HARRINGTON ET AL. v. CHAMBERS ET AL.

NEW TRIAL, WHEN NOT GRANTED WHERE EVIDENCE IS CONFLICTING.— Where the evidence is conflicting, an appellate court will not grant a new trial upon the ground that the findings are contrary to the evidence, unless the preponderance is so apparent and marked that the court can have no hesitancy in declaring that the particular findings under review are against the evidence.

ADVERSE CLAIMANT, IN A SUIT BROUGHT AGAINST AN APPLICANT FOR A PATENT, MAY SHOW that the location of the claim applied for is invalid, for the reason that the ground contained therein is embraced by a third claim, in which neither party has or claims any interest.

DECLARATIONS OF A PARTY IN POSSESSION AND CLAIMING TITLE to a mining claim, made before parting with his interest, against the validity of

the location of such claim, are admissible in evidence against the grantee of the declarant.

MINING CLAIM, WORK UPON, WHAT CONSTITUTES.—Work done outside of a mining claim, if done for the purpose and as a means of developing the same, is as available for holding the claim as if done within the boundaries of the claim itself. One general system of work may be devised, well adapted and intended to develop several contiguous claims, and when such is the case, work in furtherance of the system is work on the claims intended to be developed by it.

DEFINITION OF LODE AND VEIN.—The terms "lode" and "vein," as used in the acts of congress in reference to the location of mining claims, are such "lodes" and "veins" as are so called by miners.

EXPERT TESTIMONY IS ADMISSIBLE TO SHOW THAT A CLAIM CONTAINED SUCH A VEIN as a miner discovering it would be likely to follow, with the reasonable expectation of finding paying ore.

VALID LOCATION OF A MINING CLAIM MAY BE MADE, whenever the prospector has discovered such indications of mineral that he is willing to spend his time and money in following them, in the expectation of findin ore.

MINERAL VEIN, WHERE MAY BE SHOWN TO EXIST.—Where the validity of a claim depends upon whether a lode has been discovered and located, evidence that such claim contains a vein within its boundaries, at places other than at the discovery point, is admissible.

ERROR IN ADMITTING AS EVIDENCE IN REBUTTAL TESTIMONY WHICH IS NOT TECHNICALLY SO ADMISSIBLE is not sufficient to reverse the judgment, as such evidence might have been received in the sound discretion of the court.

APPEAL from the third district. The opinion states the facts.

*Bennett & Harkness,* for the appellants.

It was incompetent to attack the title of the Switzerland by showing that some claim not in controversy or owned by either party, had a better title. If such attack in any case would be proper, it could not be made by proof of the declarations of a third person.

The second and thirteenth assignments of error in law may be considered together. The fifth finding of fact shows no work was done on the Parley's Park claim for more than a year before the location of the Accidental. For this reason the Accidental was located. This location and a conveyance to defendant were set up by supplemental answer. The twelfth, thirteenth, fourteenth, fifteenth, and sixteenth findings of fact show this claim was held and worked in compliance with mining laws. To obviate this, and to prove work

on the Parley's Park claim, the plaintiff showed work on the shaft on the Lady of the Lake claim, and the findings in favor of plaintiff are based on this work, shown by the evidence of Benjamin W. Morgan; the admission of this evidence was error: U. S. R. S., sec. 2324; 43d Congress, c. 41, p. 315; *Mt. Diablo Co.* v. *Callison*, 5 Saw. 440.

The law requires the discovery of a lode—not of something a miner may call a lode. If as experts the witnesses could give opinions, they could only give their own opinions, and it was not competent for them to state what would be the opinions of miners. This is extending the testimony of experts beyond the bounds of facts and their own opinions on the facts, and further than any authority will justify: 1 Greenl. Ev., secs. 440, 441; 53 N. Y. 603; 54 Id. 90.

The witnesses on the part of the plaintiff, to prove a discovery of a lode at the time of location, were permitted to state indications of a vein at other points on the claim, and to compare indications at the Parley's Park discovery with indications at the surface in other mines. The question disputed was as to the existence of a lode at the discovery point, and the evidence had no tendency to prove this.

*Sutherland & McBride,* for the respondents.

The great weight of the evidence is in favor of the finding that a vein was discovered in the Parley's Park. But on protest suits the issue is made exclusively on the question of the "right of possession," and the mineral character of the claim is not one submitted to the jurisdiction of the court by the law.

The portion of the fifth finding of fact noticed in the third assignment of error on the motion for new trial is an objection to the testimony introduced of work done on the shaft located on the Lady of the Lake claim, to prove assessment work on the Parley's Park claim. The testimony is relevant and proper: *English* v. *Johnson,* 17 Cal. 107.

The late case of *Mt. Diablo M. Co.* v. *Callison,* 5 Saw. 440, fully sustains this rule and the ruling below.

It is objected that the witness Kennelly was allowed to state what Caine, one of the locators of the defendants' claim, the Switzerland, said about the location and its being bad,

as against the Ontario Extension claim, in which he was also interested. As the testimony was as to the declarations of one owner and claimant, it was as proper as any other admission made by a party against his interest. But as the court found the fact of the Switzerland location and all the other facts of recording, working, and labor necessary to make it good, and held it bad because it was subsequent in time to the Parley's Park location, it is certain that the evidence did the defendant no injury. This is made so clear by the finding of the court, that even if the evidence was erroneously admitted, this court would not reverse on that ground—the court below disregarded it by the finding.

The objection to the opinions of miners as to what is a lode is urged on the ground that an expert can only give his own opinion. The questions asked and answered are almost literally taken from the definition given by Field in the Eureka-Richmond case. They were proper if the questions were in issue, which we deny: *Kahn* v. *Old Tel. M. Co.*, Utah Supreme Court, 4 Saw. 502.

It is assigned for error that the plaintiffs were permitted to prove indications of a vein at other points in this claim than the place called discovery.

It would be the veriest mockery of justice to hold that a prior locator of a claim should lose his location because on a question arising years after the location, it might appear that in fact he put his discovery point in what was barren of ore, although the claim did in fact contain a vein. Hundreds of veins are first located in float, and instances have occurred of thousands of dollars being spent in finding the vein in place, and it can scarcely be the case that if a locator misses the vein by a few feet, that when he afterwards finds and develops the actual vein, his location is void. Such an interpretation of the law would be juggling with the rights of the miner; would unsettle and ruin hundreds of titles, and is not according to the law which only requires ore " within the limits " of the claim.

Placing the testimony on the ground that the evidence had a tendency to show a vein at discovery, it was entirely within the rule making it admissible. If the vein is in doubt at one point on all the proof as to its character, evidence tend-

ing to show its continuity, as well as its character at other points, may remove or clear up the doubt. No vein is at all points equally good. The best at places are barren, and proof of continuity, with ore at different places, affords a strong basis for inference as to its character at the controverted point. Besides, a vein is a unit. A discovery at one point in its course is a discovery of the vein, and proof of its character at any point fills the purpose of the law. ·

The testimony received at the close of the case was admissible: 1. It was properly evidence in rebuttal; 2. On the ground that in its discretion the court could admit it at any stage of the case. To refuse the testimony might have been error; to admit it could not prejudice the defendant.

EMERSON, J. :

The appellants having made application for the government title to certain mining ground known as the Switzerland claim, the respondents filed an adverse claim to a portion of the premises, under a mining claim known as the Parley's Park, and thereupon commenced this action to determine the right of possession of the ground in controversy.

The case was tried by P. L. Williams, esq., referee, and upon his report of findings of fact and conclusions of law, a decree was rendered in favor of the respondents. A motion for a new trial was made, which was overruled. Thereupon this appeal was taken from the order overruling the motion for a new trial and from the judgment. The record contains the following:

"It is stipulated by the counsel that the testimony taken be considered as taken in all the cases; that will be so as to all the testimony; that being taken in one case is to be used in all the others as far as applicable."

Besides the above-entitled case, there were referred to the same referee a cross-suit between the same parties involving the same questions and subject-matter, the parties therein being merely reversed; also an action by defendants against the plaintiffs involving the same mining ground, the plaintiffs therein representing the Como tunnel and the defendants therein the Parley's Park mining claim; also an action by the defendants representing the Parley's Park claim against

Harry Rickard et al., applicants for and representing the Ontario No. 1 Extension East mining claim, which suit involved the right to the same mining ground in dispute in the principal case, and the foregoing stipulation refers to all of said · actions, the attorneys of record being the same in all."

The referee reported the following findings of fact and conclusions of law:

### FINDINGS OF FACTS.

1. That the locators of the Parley's Park mining claim, mentioned in the complaint, at the time of the location of said claim, viz., on the nineteenth day of July, 1872, at the "discovery point" of said claim, discovered a mineral-bearing vein or lode, and the claim was duly recorded August 9, 1872.

2. That soon after said location, to wit, in the month of August, 1872, the locators of said Parley's Park mining claim marked on the ground the boundaries of said claim by setting stakes at the corners thereof.

3. That prior to the twenty-fourth day of July, 1874, and within a year preceding that time, the owners of said claim performed labor and made improvements thereon of one hundred dollars in value.

4. That each year thereafter, up to July 19, 1878, work of the value of one hundred dollars was done on said claim by the owners thereof.

5. That during the year beginning on the nineteenth of July, 1878, the owners of the Parley's Park claim were also the owners of two certain . claims, called respectively the "Central" and "Lady of the Lake," the Central adjoining the Parley's Park, and Lady of the Lake adjoining the Central mining claim, and that with a view to the future working and development of all three of said claims, the owners thereof located what is called the "main shaft" in the Lady of the Lake surface ground; that said shaft is in such proximity to said Parley's Park mining claim; that work in it has a tendency to develop said claim, and said shaft was located and intended for the purpose of developing all of said claims.

I find that during said last-named year, work was prosecuted in said shaft, and by improvements made thereat, ex-

ceeding in value three hundred dollars, and of not less than two thousand dollars in value. No work was done in said year after July 19, 1878, and prior to the fifteenth day of September, 1879, in the Parley's Park surface ground, or within its limits, by the owners thereof. I also find that to the Lady of the Lake mining claim an application for patent was entered and paid for at the United States land office at Salt Lake City, Utah, no protest having been made prior to July, 1878, but no patent for said claim has yet been issued.

6. That at the time this action was commenced the plaintiffs were in possession of said Parley's Park mining claim; that by the admission of the defendants on the trial, the plaintiffs at the commencement of this action had the title to said mining claim by regular conveyances from the locators; that the Parley's Park Silver Mining Company was organized as a corporation on the nineteenth day of March, 1879, and on or about the first day of June, 1879, received a conveyance from said plaintiffs of said mining claim, and possession thereof, and this suit is prosecuted in the interest and for the benefit of said corporation.

7. Before and at the commencement of this action the defendants claimed an interest in only a part of the premises embraced in said Parley's Park mining claim, and claimed said interest adverse to said plaintiffs; that said adverse claim consists of, and was based solely on, an alleged mineral location, made in October, 1874, called the Switzerland, which embraced a part of the said Parley's Park claim described in the complaint.

8. On the third day of October, 1874, James Caine, Mike Heffron, and John Cammerman entered upon the ground described in the pleadings as the Switzerland mining claim, and marked the boundaries as set forth in the answer and posted at the discovery point on a vein of mineral-bearing rock in place, by them opened and discovered, a notice of said claim, which notice described the said claim set forth in the answer, and afterwards, on the fifth day of October, filed a copy of said notice as posted for record with the recorder of the district, which notice was recorded as follows:

NOTICE OF SWITZERLAND LODE.

We, the undersigned, claim fifteen hundred feet on this lead, lode, or ledge, or deposit of mineral-bearing rock or metal therein.

We claim one hundred and forty feet north-westerly to the Ontario line, and we claim one thousand three hundred and sixty feet south-easterly from this notice and monument, with one hundred feet on each side of the vein for working purposes; we claim all the rights and privileges guaranteed to us by the mining laws of the United States and the local laws of this district. This location is situated one hundred and forty feet south-west of the south-west boundary line of the Ontario patent line stakes, in Uintah mining district. Located October 3, 1874.

JAMES CAIN,       300 feet.
MIKE HEFFRON,     500 feet.
JOHN CAMMERMAN, 200 feet.

That afterward, and on or about the fifteenth of April, 1876, the attention of the persons who had recorded the notice was called to the discrepancy between the record and the notice filed for record, said person having in the mean time ceased to be recorder of the district, and thereupon said person changed said record to correspond to the notice filed.

9. That the locators of said Switzerland claim and their grantees claiming under said location have in each year since done work and made improvements thereon of the value of more than one hundred dollars, and have been in the continuous possession of said improvements.

10. That the defendants by conveyances from the locators and their immediate grantees, at the time of the commencement of this action, had acquired and still have the record title to said claim, and own all the title and interest therein which could be acquired from said locators, and by subsequent compliance with mining laws and customs.

11. The discovery point of the Switzerland claim, and the point where the location notice was posted, is within the bounds of the Parley's Park mining claim.

12. That on the thirteenth day of September, 1879, Thomas Cassidy, claiming the Parley's Park mining claim was for-

feited for want of work and improvements, located a mining claim called the "Accidental," embracing the premises in dispute in this action, and all that part of the Parley's Park mining claim lying easterly of the easterly end line of the Ontario mining claim.

13. Said Cassidy, on said day, posted a written notice of location on a lode of rock bearing silver, found within said claim, and at the discovery point. Said notice described the claim by reference to natural objects and permanent monuments, so it could be identified, and described it by metes and bounds, and also contained the name of the locator and date of location.

14. Said Cassidy, on the fifteenth day of September, 1879, filed a copy of said notice of location in the office of the recorder of said Uintah mining district, for record, where the same was duly recorded.

15. Said Cassidy and his grantee of said claim have in each year since said location done work and made improvements thereon of the value of more than one hundred dollars.

16. On the nineteenth day of September, 1879, the said Cassidy conveyed said Accidental claim to the defendant, Robert C. Chambers, who has ever since owned the same.

And the following are my

### CONCLUSIONS OF LAW:

1. That the plaintiffs, at the commencement of this action, were the owners and in possession of the mining claim called the Parley's Park, which was then, and still is, a valid mining claim, embracing the premises described in the complaint, subject only to the paramount title of the United States; that the same is now owned and held by the Parley's Park Silver Mining Company by like valid title derived from the plaintiffs during the pendency of this action.

2. That the defendants have no title or interest in said premises, and had none at the time this action was commenced.

3. That said plaintiffs, or their grantees, are entitled to judgment or decree declaring and confirming their title to said Parley's Park mining claim, and the premises embraced therein, and that the defendants have no right, title, or interest in said premises, or any part thereof, and also for costs of this suit.          P. L. WILLIAMS, Referee.

In reviewing the case, I shall follow the order adopted by the appellants in their brief.

The first point made by them is, that the first and second findings of fact are against evidence.

The statement on the motion for a new trial, which by the stipulation of the parties is made the statement on this appeal, consists of a transcript of all the testimony taken on the trial of the case. As it was nearly all directed to these points, it could not well be summarized on the argument; neither can it in this opinion. Since the submission of the case I have gone over all the testimony with these objections in view. This review clearly discloses the fact that there is a substantial conflict in the testimony as to these points. .As these were among the main contested points in the case, it would have been strange indeed if it had been otherwise than conflicting.

It is usually an unpleasant and often a difficult task for an appellate court to determine the truth where there is a conflict of testimony. It is much more difficult than for a trial court in determining upon its findings, or in arriving at a conclusion upon a motion for a new trial, because so much depends upon circumstances which can not be presented by or preserved in a transcript. The same considerations will apply with equal force to the mind of the lower court when the testimony is taken, and findings presented by a referee. It is mainly for this reason that it has become the settled doctrine of the courts, that the findings of the trial court will not be disturbed unless the preponderance is so apparent and marked that the appellate court has no hesitancy in declaring that the particular finding under review is against the evidence. This is the settled doctrine of this court: *Walker* v. *Popper*, 2 Utah, 281; *Dewey* v. *Snyder*, Id. 344. For this reason we ought not to disturb these findings.

The second point urged upon our attention relates to that portion of the fifth finding of fact which states that the main shaft of the "Lady of the Lake is in such proximity to said Parley's Park mining claim, that work in it has a tendency to develop said claim." It is claimed by the appellants that there is no evidence to support this part of the finding.

The testimony, uncontradicted, established as a fact, as .

stated in the finding, that "the owners of the Parley's Park claim were also the owners of two certain claims called respectively the Central and the Lady of the Lake, the Central adjoining the Parley's Park, and the Lady of the Lake adjoining the Central mining claim; and with a view to the future working and development of all three of said claims, the owners thereof located what is called the main shaft in the Lady of the Lake surface ground." The testimony was also uncontradicted as to the object for which the shaft was located, and its relative location, which was further shown upon the maps put in evidence. It is true, no witness testified in the exact words of the finding objected to, nor was this necessary in order to support the finding. The portion of the finding objected to is a statement of the ultimate facts found by the referee, from this uncontradicted testimony, and is warranted by the facts and circumstances in proof.

The first error of law urged by the appellants relates to the reception of the testimony of one Kennelly over this objection. The testimony and objection were as follows:

"The Switzerland was first claimed in 1874, I think; I don't know whether work was done on the Parley's Park in 1874 or not; that year Dutch John and Caine were working at the Switzerland discovery eighty or one hundred feet southeast of the Parley's Park discovery, and very close to where the shaft is put down; there was very little work done when I first saw it—might have been twenty-five dollars' worth, more or less; the claimants were then at work; I was at work on the Ontario Extension No. 1, east, for Harry Rickard; this claim covered nearly the same ground as the Switzerland, and the north line of it was north of and included the Switzerland discovery point, and I had a conversation with Caine and others working on the Switzerland in regard to these two claims.

"Q. What did they say about the conflict between the ground you were on and their ground? Objected to by defendants' counsel as incompetent and immaterial to show what was claimed between the Rickard ground (the Ontario No. 1), and the Switzerland. Objection overruled. Defendants except.

"A. The owners of the Switzerland stated the title of the

Ontario No. 1, east, was the best title of the two—that the title of the Switzerland was no good; Jim Caine said so; he located both claims as I understood."

It is claimed on the part of the appellants that "it was incompetent to attack the title of the Switzerland by showing that some claim, not in controversy nor owned by either party, had a better title. If such attack in any case would be proper, it could not be made by proof of the declarations of a third person."

The Ontario No. 1 claim was not involved in this controversy. The appellants were claiming title, by location and work, to the Switzerland, and it was because they had applied for a patent for the latter that this suit was brought. The basis of the appellants' right to a judgment in their favor was a valid location of the Switzerland. For that to be valid, the ground must have been unoccupied and subject to location under the mining laws.

The object of this testimony, and the only effect it could have, was its tendency, more or less cogent, to show that the location of the Switzerland was invalid. The validity of the location of the Ontario No. 1 had nothing to do with the cost, and was of no matter of consequence only so far as it was given as a reason by the declarant why the location of the Switzerland, upon which the appellants based their right, was invalid, and this effect would follow because they sought by the latter location to appropriate ground already occupied by the Ontario No. 1.

The respondents had the same right to controvert the validity of the Switzerland location on this account as for any other reason which would render it invalid. The question and testimony, taken together, is as if the witness had been asked, What was said about the validity of the Switzerland location? A question which probably, under the circumstances, would not have been objected to; and to which the answer must necessarily have been the same as that given.

The question is not, therefore, obnoxious to this portion of the objection.

Neither is it subject to the objection usually applicable to the declarations of third persons. It was the declaration of

an owner, made before he had parted with his interest, and while in possession of and at work upon the ground which was the subject of the conversation. It fairly comes within the rule allowing the admission of declarations. That the declarant was not a party to the then pending suit, and had, since making the declaration, parted with his interest, does not affect the right.

But even if this were not so, as the referee found the fact of the Switzerland location, and all the other facts of the recording, working, and labor necessary to make it good, but held it bad because it was subsequent, in point of time, to the location of the respondent's claim, the Parley's Park, it is absolutely certain that the reception of this evidence did no injury to the appellants' case, even if its reception could by any possibility be held to have been error. The findings show that the referee entirely disregarded this evidence, for so far as they relate to the Switzerland claim they are against it.

The contrary clearly appearing, no injury will be presumed, even if the appellants' objection had been well taken, and the exception of the testimony erroneous. When the record discloses the fact that an error of the court in admitting evidence has not prejudiced the party objecting, the error will not justify a reversal of the judgment: *Snell* v. *Crow*, decided at this term.

The second and thirteenth assignments of error at law will be considered together. They are as follows:

" 2. Also in overruling defendants' objections to the testimony of the witness Benjamin W. Morgan, and permitting him to testify concerning the location of the Lady of the Lake main shaft, its object, and to doing work thereon as and for work on the Parley's Park claim, and in overruling defendants' motion to strike out all evidence admitted concerning said shaft and work done thereon."

" 13. The referee erred in not finding, as matter of law, that the Parley's Park claim was forfeited for want of work and improvements from July 19, 1878, to September 15, 1879, and the Accidental location therefore valid."

At the trial it was admitted that the Parley's Park Mining Company had succeeded to the interest of the plaintiffs.

According to the fifth finding of fact, no work had been done after July 19, 1878, and prior to the fifteenth day of September, 1879, on the Parley's Park surface ground or within its limits by the owners thereof.   And that the "main shaft" was located within the surface boundaries of the Lady of the Lake, for the purpose of developing the three claims mentioned, and several thousand dollars' worth of work done thereon during the year, beginning on the nineteenth of July, 1878.   The findings further show that during the pendency of the suit, and under the claim that the Parley's Park was forfeited for want of work, the Accidental claim was located, embracing the premises in dispute.   The fact of this location and a conveyance to one of the defendants was set up in a supplemental answer.   From the findings of fact, it further appears that the last-named claim was held and worked in compliance with the mining laws.   To obviate this, and to prove that the Parley's Park claim had not been forfeited, the respondents showed the location of the main shaft above referred to, its object, and the work done upon it.   The findings in favor of the respondents are based upon this work.

The testimony referred to in the second assignment of error of law is as follows:

" B. W. Morgan, sworn for plaintiffs, says : The Parley's Park Mining Company, an incorporation, is in possession of the Parley's Park, Central, and Lady of the Lake claims.   The property was deeded to them in May, 1879.   I am one of the directors, and have represented the company here, and have had something to do with the purchase of the property.   *   *

" Q. In the season of 1879, state what the company referred to did with reference to the working of their three claims.

" Objected to by defendants, as immaterial and irrelevant to prove what was done upon the Parley's Park—it is immaterial to prove what they did to the three claims.

" Objection overruled; defendants except.

"A. I went there in company with Mr. Frank Eastman, surveyor, and Mr. Dahlgleish, to locate the shaft.   Mr. Eastman had an instrument with him, and we got the corner post of the Lady of the Lake first.   This was in June, 1879.   We measured from that point and got the boundaries of the Lady

of the Lake, the Central, and the Parley's Park; then located the shaft-house about half-way between the east end of the Ontario claim and the east end of the Lady of the Lake claim. I think Mr. Coullard was there and helped us measure it, and pointed out the points. We located the hoisting-works and the shaft.

"Q. What was the object of the shaft?

"Defendants objected, on the ground before stated.

"Objection overruled; defendants except.

"A. The object of the shaft was to develop all the property of the Parley's Park Mining Company—the Parley's Park, Central, and Lady of the Lake claims. The object was expressed; measurements were made for that purpose. We located the shaft as near to north side of the Lady of the Lake ground as possible, for the purpose of catching the vein on the dip. We projected a shaft six hundred feet deep, double compartment—one compartment four and a half by five feet, and the other five by six feet. It was to be timbered by timbers and wall-plates, about twelve inches square, and cross-timbered twelve by fourteen inches, and three-inch lagging of the timbers five feet apart from center to center.

"Q. You say the contract was let?

"Same objection, ruling, and exception.

"A. Yes; to J. J. Dahlgleish, in June or the early part of July. Work was commenced the next day after the measurements, and the work continued from that time.

"Q. What amount was expended prior to the nineteenth of July?

"Objected as above, and same ruling and exception.

"A. I could not exactly answer, but I should say several thousand dollars. In pursuance of this plan of sinking the shaft, machinery had been purchased, boilers and engines, and everything else. Work was done on the ground to the amount of a good many hundreds of dollars—over three times three hundred dollars—on the nineteenth of July. Work was kept up the time, and has been continued since pretty near all the time."

All the foregoing testimony of the witness B. W. Morgan in regard to the location of and work done on the shaft on the Lady of the Lake ground was taken under defendants'

objection, and defendants' counsel now moved to strike the same out on the ground first stated in the objections.

The court overruled the motion, and defendants' counsel excepted.

"*Cross-examined.*—No public notice was put up or recorded touching the purpose of sinking that shaft. The Lady of the Lake was not a patented claim. The entry had been made and it was passed. The patent had not come from the department. The shaft and work were entirely within the limits of the Lady of the Lake claim."

The testimony and the facts found bring the case within the spirit and meaning of the amendment to section 2324 of the United States revised statutes.

There is nowhere in the whole case the least intimation that the work done or that proposed was located in bad faith, or that it was in any way a subterfuge, or that there had ever been any contrary statement or claim than the one now set forth and relied upon. On the contrary, there is uncontradicted testimony that it was all done in the utmost good faith, as is evidenced, among other things, by the character and permanency of the work, and the large amount of money expended.

There was no more reason for a public notice being given or recorded of the purpose of sinking the shaft, or of running any tunnel in connection therewith, than there is of any other manner in which claimants propose to develop their claims. Neither the laws of congress nor the rules and customs of miners require it. The case is different where a tunnel is located and run for the discovery of "blind lodes."

True, there was no testimony that what is technically called a tunnel was yet run or commenced, as under the circumstances detailed, that would not be done until they should, as the witness states, "catch the vein on its dip." This work was necessarily the preliminary work to starting the tunnel, and was, in good faith, done for the development of all the claims.

The language of the court in *Mt. Diablo M. & M. Co.* v. *Callison*, 5 Saw. 439, is applicable to the facts in this case. In that case the court say : " Work done outside of the claim, or outside of any claim, if done for the purpose and as a

means of prospecting or developing the claim, as in the case
of tunnels, drifts, etc., is as available for holding the claim as
if done within the boundaries of the claim itself.  One gen-
eral system may be formed well adapted and intended to work
several contiguous claims or lodes, and when such is the case,
work in furtherance of the system is work on the claim
intended to be developed by it."

"A general system of work for the exploration of the whole
ground embraced in these three sets of contiguous claims
seems to have been carried on by plaintiff, and we think all
work done was a part of that general system, and, as such,
applicable to all the claims, which had by purchase been con-
centrated in a single party, the plaintiff."

The testimony in the case before us leaves no room for
doubt, and such is the express finding of the referee, that the
work in question was done for the express purpose of devel-
oping the three claims owned by the respondents, one of
which is the Parley's Park, and, under the decision above
quoted, is as available for holding that claim as if done on
the claim itself.  This holding is also in harmony with the
principle enunciated in *English* v. *Johnson*, 17 Cal. 107.

The third assignment of error in law is on the admission
of the opinions of certain witnesses, "that at the Parley's
Park discovery shaft there was such a vein or indication as a
miner would be likely to follow with reasonable expectation
of finding ore; and in permitting witnesses to testify there
was such a vein as a miner would locate, and in permitting
witnesses to answer questions in various forms that the vein
there was one a miner would locate and follow."

It is claimed by the appellant, that "one of the disputed
questions of fact was the claimed discovery of a lode in the
Parley's Park claim.  Nine witnesses were permitted to say
that there was such a vein or such an indication of a vein as
a miner would locate or follow with the expectation of get-
ting ore."  And further, that "if as experts the witnesses
could give opinions, they could only give their own opinions,
and it was not competent for them to state what would be
the opinions of miners."

The question put to the first witness interrogated upon this
point, together with the testimony upon this point, is taken

as a sample of that of all the others, all being the same in substance, and is as follows:

"It is brecciated matter at the top—quartzose matter with iron stain. I should say it was a very good indication for ore. I should call it a mineral vein, that is, in the miner's acceptance of the term. It is marked so as to be distinguishable from the inclosing rock by color and texture, and it is distinct in the walls and well marked. The vein is a little narrower on the west side than on the east side of the shaft, and its course is easterly and westerly.

"Q. State whether or not that was such a vein as a miner discovering it would be likely to follow with the reasonable expectation of finding paying ore.

"Objected to as incompetent, and not the subject of an opinion for an expert. Objection overruled; defendants except.

"A. I would consider it a good indication to follow."

It will be noticed that by this question the witness was not asked to give his opinion or "to state what would be the opinion of miners," but state what, in his opinion, others conversant with the business of mining and locating mines would have understood the indications described by him to mean, and how they would have acted upon this understanding.

Each of the witnesses had been shown to have had superior knowledge and practical experience as a miner, and was undoubtedly qualified to speak upon the subject. Each had given a detailed statement and description of the indications in question, and had given his opinion, or rather how he would have acted in reference thereto. The right to go thus far was not questioned by the appellants. They claim, however, that the question following this testimony, and as above quoted, is within the prohibition as laid down, and referred to by them, in 1 Greenl. Ev., sec. 441, that a witness should not be allowed to state his views "on the manner in which other persons would probably be influenced, if the parties acted in one way rather than in another."

So far as my examination has extended, this principle has been mainly discussed in connection with cases arising out of policies of insurance, and relating to the misrepresentation of, or the withholding of information by, the insured. In

those cases the principal question discussed has been the right to call persons acquainted with the business of insurance to give their opinions as to the materiality of a misrepresentation or concealment. Upon this question there is a conflict of authority, both in this country and in England. It is now thought, however, that the arguments in favor of the admission of such evidence outweigh those urged against it.

The language of the court in deciding the case of *Chapman* v. *Walton*, 10 Bing. 57, is peculiarly applicable to the case at bar.

That case was a suit against an insurance broker for negligence in not having procured proper alterations to be made in a policy of insurance, on information conveyed to him by letter, in which he was told that the voyage was altered, and it was "left with him to do the neeedful with it."

The defendants' counsel, for the purpose of proving that his client had acted prudently in the matter upon the information he had received, and was therefore guilty of no negligence, called several policy brokers, and putting into their hands the policies, the bills of lading, and invoices of the goods and the letter, asked: "What alterations of the policies a skillful insurance broker ought, *in their judgment*, to have procured, having these documents in his possession, and being instructed to do the needful ?"

The answers were, "That they thought he would do ample justice by procuring the alterations as made." The jury found for the defendant, and a rule for a new trial was moved on the ground that this evidence had been improperly admitted. The rule was discharged, Lord Chief Justice Tindal, in deciding the case, among other things, saying: "But it is not a simple abstract question, as supposed by the plaintiffs, what the words of the letter mean; it is what others conversant with the business of a policy broker would have understood it to mean, and how they would have acted upon it under the same circumstances; * * * and this conclusion, it appears to us, neither judge nor jury could arrive at from the simple perusal of the letter, unassisted by evidence, because they would not have the experience upon which a judgment could be formed."

It appears, in the case at bar, that the locators of the Par-

ley's Park claim had interpreted the indications which nature had placed upon the surface of this claim to mean that there was a deposit of valuable ore beneath, and with these indications before them the witnesses were asked if they and others of their class skilled in their business would construe them to mean the same.

In neither of the cases, *Higbee, Executor etc.,* v. *Guardian Life Ins. Co.,* 53 N. Y. 603, and *Steinbach* v. *Lafayette Life Ins. Co.,* 54 Id. 90, referred to by appellants, is the principle decided in the case above quoted from, or involved in the case at bar, either decided or discussed. In the first of the two above-named cases, a physician, called by the defendant, after describing certain symptoms he saw in a casual acquaintance, indicative that the assured had severe headaches, was asked whether he knew enough from what he saw and the information received from the deceased to determine as to the character of these headaches. He answered, in substance, that he got an impression sufficient to satisfy his own mind, but not enough to base a medical opinion upon. He was then asked to state the impression made on his own mind, which question was, upon objection, excluded. *Held,* no error, as it called for an opinion based upon conjecture simply; that the opinion, to be proper evidence, must be based upon facts; that the witness could not speak from mere impressions.

In the second case, the question put to the witness was whether, in his opinion, certain articles, or articles of a certain class which were specially hazardous, formed a part of the line of business of certain traders. The evidence was excluded. In deciding the case, the court says: "The defendant's question involved the element of opinion on the part of the witness, as to the propriety of considering fireworks as forming part of the line of business of German jobbers and importers. That was of no sort of consequence, the material point being whether, in fact, the persons known in trade under the designation mentioned did usually and generally, as matter of fact, keep fireworks. 'Accordingly, the judge at the trial ruled that the opinions of witnesses could not be substituted for facts, and while excluding the question under consideration, instructed the defendant's counsel that he was at liberty to ask if the persons whom the witness knew in.

Baltimore carrying on the kind of business that the plaintiff did usually kept fireworks. * * * The question what things were in the line of business the plaintiff was carrying on was not one to be answered by opinions of experts, but by an investigation of facts, and the judge, was therefore correct in excluding evidence of opinions on that point, on the part of the witness." No one will question the soundness of these decisions. They are not, however, applicable to the principles involved in the questions under consideration, nor to the facts in this case. These questions did not aim at the substitution of the opinions of the witnesses for the facts. The facts as they existed had all been described, and the conclusions to be drawn from them, involving as it did special knowledge and skill, were a proper subject for expert testimony: *Kahn* v. *Old Telegraph Co.,* 2 Utah, 174.

The element involved in the answers to the questions under consideration is very much the same as that in answer to questions requiring the opinion of witnesses touching the market value of property. In cases where market value is not ascertained by precise facts, but rests on opinion, that is not always an opinion of what others would give for it, that is, consider it worth, or what it would bring in the market.

Both on principle and on the authority of the decided cases, the evidence was properly admitted. And this will be the more apparent if we consider what was the real meaning of the question. As stated above, it did not require the witnesses to state what the opinion of other miners would be, but if the indications which they saw and had described were such as miners would follow expecting to find ore, or in other words, Was it, in your opinion, a mineral vein?

But, say the appellants, the law requires the discovery of a lode, not of something which the miner may call a lode.

The discussion of this portion of the objection will dispose of the fourth and fifth assignments of error at law.

The mining law of congress provides that " no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located."

In the well considered and reasoned opinion of Judge Field, in the Eureka-Richmond case, 4 Sawyer, it is decided that the miner's definition or understanding of a lode is what

is meant by the mining acts of congress or 1866 and 1872, and that a lode is "whatever the miners could follow and find ore."

This interpretation of the law will commend itself to the good sense of every one at all familiar with the subject, and has practically received this interpretation by the miners throughout all the mining region.

By the questions referred to, the witnesses were asked if, in their judgment as experienced miners, the facts and appearances which they had seen and described formed what Judge Field says constitutes a vein or lode within the meaning of the act of congress above referred to.

I have long thought, and still think, that, under the requirements above quoted, a valid location of a mining claim may be made whenever the prospector has discovered such indications of mineral that he is willing to spend his time and money in following, in the expectation of finding ore, and that a valid location may be made of a ledge deep in the ground and appearing at the surface, not in the shape of ore, but in vein matter only. This is a fair, reasonable, and I believe correct construction of the mining law upon this subject.

Objection is made that testimony was received tending to show that there were indications of ore or vein matter at other points on the surface of the Parley's Park claim than at what was called the discovery.

A sufficient answer to this objection is found in the statement of the referee, that he would receive the testimony "for the purpose of showing a continuity of the vein testified to at the discovery point."

Without this limitation upon the effect which the court declared he should give to the testimony, it was proper and admissible.

The ore, or the indications which determine the prospector to make the location, are seldom confined to one spot. Neither is there any requirement of the law which compels him to name as the discovery point the precise spot where he first finds the ore or the indications which, to his mind, form the lead or lode. In fact, before the location is made, an examination or tracing is often required to determine its

course, and in doing this, the croppings may be found in numerous places. Which will finally be marked as discovery may depend upon considerations of convenience for work, description, monuments, etc. It was competent for the plaintiffs to show that ore, or mineralized rock, or whatever the "miner could follow and find ore," was not only at the place marked "discovery," but cropped out at other points within the "limits of the claim located," and thus strengthen the testimony, already in, in reference to the indications at the point called "discovery."

The sixth assignment of error at law relates to the exclusion of the testimony of one McBride, offered to prove the value of certain work. The work upon which he was called to pass an opinion was done some years before he came into that camp or knew anything about it. He did not pretend to know the value of it at the time it was done, and that was the material thing to know, or rather what he was offered to disprove. He was allowed to state the length of time, in his judgment as a miner, it would take to accomplish it. What had been done was there for his inspection. With that as a basis, if he had known what were at that time the usual or going wages, the value of the work would not have been a matter of opinion, but simply a mathematical computation. This he did not pretend to know; in fact, stated that he did not know, and his opinion was rightfully excluded.

The last assignment of error at law relates to the admission, on the part of the plaintiff, of certain testimony, chiefly certificates of assay, after the defendants had closed their case. It was claimed that the testimony offered and received was not rebutting.

The reception of testimony at that stage of the case, if not strictly or at all rebutting, was within the sound discretion of the court. It does not appear that this discretion was abused, but was wisely exercised in the admission of the testimony, in view of what the record discloses as to the cases then on trial, and the situation of the parties.

The judgment of the district court is affirmed.

HUNTER, C. J., concurred.

TWISS, J., dissented.