BOOK et al. v. JUSTICE MIN. CO.

(Circuit Court, D. Nevada. September 18, 1893.)

No. 568.

1. MINING CLAIMS—LOCATIONS.

The location of a vein or lode, under the mining laws of the United States, is made by taking up a piece of land in the form of a parallelogram, not exceeding 1,500 feet in length and 600 feet in width, 300 feet on each side of the middle of the vein at the surface. The location must be distinctly marked on the ground, so that its boundaries can be readily traced.

2. SAME—MARKING OF BOUNDARIES—SUFFICIENCY OF.

The question as to the sufficiency of the marking of the boundaries depends to some extent upon the character and condition of the ground located. Where the location is made upon a comparatively barren hillside, the posting of stakes at each of the four corners of the location, either by driving the stakes into the ground, or building of stone monuments so as to keep the stakes in place, is a sufficient compliance with the provisions of the law.

3. SAME—WHEN RIGHT OF POSSESSION BECOMES VESTED—REMOVAL OF STAKES.

When the location is marked so that its boundaries can be readily traced, the locator's right of possession becomes fully vested, and cannot be divested by the removal or obliteration of the stakes, monuments, or notice, without the act or fault of the locator, if he performs the other acts required by law.

4. SAME—NOTICE OF LOCATION.

The mining laws of the United States do not require any written notice to be posted upon the location when made, and, in the absence of any local rule or regulation or state law requiring a notice to be posted, the location, the boundaries of which are properly marked upon the ground, is valid without the posting of any notice.

5. SAME—LOCATION NOTICE LIBERALLY CONSTRUED.

Where the statutes of the state, or local rules and regulations of miners, require notices to be posted upon the ground at the time the location is made, the construction given to the notices should be liberal, not technical.

6. SAME—COURSE OF LINES CONTROLLED BY STAKES.

A mistake in the notice as to the direction and course, being "northerly" instead of "northeasterly," does not invalidate the location. Positive exactness as to the course is not required. The stakes and monuments referred to in the notice, and posted upon the ground, will control the direction stated in the notice.

7. SAME—RECORD OF LOCATION—REFERENCE TO ANOTHER MINING CLAIM.

When a notice of location is recorded, it must contain the name or names of the locators, the date of the location, and such a description of the claim or claims located, by reference to some natural object or permanent monument, as will identify the claim. A reference to a known mining claim is a sufficient compliance with the law requiring reference to be made to some natural object or permanent monument.

8. SAME—ANNUAL WORK—LABOR AND IMPROVEMENTS—WORK OUTSIDE OF THE LIMITS OF THE CLAIM.

The mining laws of the United States require that not less than $100 worth of labor shall be performed or improvements made during each year upon every unpatented location. Labor and improvements, within the meaning of the statute, are deemed to be done upon the location when the labor is performed or improvements made for the express purpose of working, prospecting, or developing the ground embraced in the location. Work done outside of the limits of a mining claim, for the purpose of prospecting or developing it, is as available for holding the claim as if done within the boundaries of the location of the claim.

9. SAME—WORK ON DIFFERENT CLAIMS OWNED BY SAME PERSONS — RUNNING TUNNELS—WHEN SURFACE WORK NOT REQUIRED.

The running of a tunnel for the purpose of prospecting, developing, and working of two separate and distinct mining claims owned by the same person is to be credited to both of said claims, and, if the necessary amount of work is done, it is deemed a sufficient compliance with the law; and the owner is not, in such a case, required to also perform work on the surface of the locations, in order to hold the same.

10. SAME—ST. NEV. 1887, P. 136, § 2, CONSTRUED — PRIMA FACIE EVIDENCE—FAILURE TO HAVE WORK RECORDED DOES NOT AMOUNT TO FORFEITURE OF CLAIM.

In construing the act requiring owners of mining claims to make affidavits as to the amount of work done, and to have the same recorded,

(St. Nev. 1887, p. 136,) *held,* that the object of the act was to prescribe a definite way in which the proof of the performance of the work might be obtained, that the act was not intended to prevent the owner from making the proof in any other way, that it simply makes the record prima facie evidence of the facts therein stated, that a failure to comply with the terms of the act does not work a forfeiture, and that a forfeiture of a mining claim can only be established by clear and convincing proof of the failure of the owner to comply with the provisions of the law as to the amount of work required to be done.

11. LOCATIONS OF MINING CLAIM IN NAMES OF INDIVIDUALS FOR BENEFIT OF CORPORATION — VALIDITY OF — WORK DONE BY CORPORATION BEFORE OBTAINING LEGAL TITLE INURES TO THE BENEFIT OF THE LOCATIONS.

Defendant is a California corporation engaged in mining in the state of Nevada, and on the 2d day of January, 1888, was the owner of the Justice claim,—a patented location. The locators of the West Justice and James G. Blaine locations, on that day, while in the employ of the corporation, made the locations in their own names at the expense of, and for the benefit of, the corporation. The Justice, West Justice, and James G. Blaine are contiguous to each other. The corporation annually performed work by running tunnels from the Justice claim for the purpose of prospecting and developing the mining ground embraced within the locations of the West Justice and James G. Blaine. (See opinion as to the facts.) The locators of these claims did not convey the title to the corporation until the 29th day of November, 1892. *Held,* that the locations made for the benefit of the corporation were valid; that the work performed by the corporation in running the tunnels should be credited as work done upon the West Justice and James G. Blaine; and that the work so done and performed, being sufficient in value, constituted a compliance with the mining laws.

12. SAME—LEGAL EFFECT OF SUCH LOCATIONS—RIGHT OF POSSESSION.

When a mining location is made by one person in his own name, at the request and expense of, and for the benefit of, another person, such other person is legally entitled to the possession of the mining ground so located. The locator, in such a case, holds the legal title in trust for the benefit of the person at whose expense the location was made.

13. STATUTE OF FRAUDS NOT APPLICABLE.

*Held,* that the statute of frauds had no application to the facts of this case; that, the locators of the ground having voluntarily conveyed the title to the corporation, no objection could be urged by strangers to the transaction on the ground that the original agreement as to the location of the claims was not in writing.

14. DISCOVERY OF VEIN OR LODE—WHAT CONSTITUTES—SECTION 2320, REV. ST. U. S., CONSTRUED.

Any discovery of quartz or other rock in place, bearing gold, silver, or any of the precious metals or valuable deposits specified in the first clause of section 2320, Rev. St. U. S., constitutes a "discovery of a vein or lode," within the meaning of those words as used in the last clause of said section, which declares that "no location of a mining claim shall be made until the discovery of a vein or lode within the limits of the claim located."

15. SAME—DISCOVERY OF ROCK IN PLACE—VALUE OF MINERAL FOUND.

The statute was intended to apply to any kind of a vein or lode of quartz or other rock in place, bearing mineral, in whatever kind, character, or formation the mineral might be found. The statutes should be so construed as to protect locators of mining claims who have discovered rock in place, bearing any of the precious metals named therein in sufficient quantity to induce them to expend their time and money in prospecting and developing the ground located. When the locator finds the rock in place, containing mineral, he has made a discovery, within the meaning of the statute, whether the rock or earth is rich or poor, whether it assays high or low. It is the finding of the mineral, in the rock in place, as distinguished from float rock, that constitutes the discovery, and warrants a location of a mining claim to be made.

16. SAME—EXPERT TESTIMONY—VALUE OF.

The value of the testimony of experts as to what constitutes a vein or lode depends to a great extent upon the strength or weakness of the reasons given in support of the conclusions reached. An expert witness testified that he would not call any discovery of rock bearing mineral a vein or lode, unless gold or silver was found in sufficient quantities to pay all the expenses of extracting, removing, and milling the ore therefrom, and leave a profit to the owner. *Held*, that the statute is not susceptible of any such construction.

17. "VEIN OR LODE" DEFINED—AUTHORITIES REVIEWED—APPLICATION OF.

The words "vein or lode," as used in the United States statutes, and as understood by miners, are applicable to any body or belt of mineralized rock lying within clearly-defined boundaries, separating it from the country, or nonmineral, rock. Authorities as to the definition of "lodes or veins" reviewed at length, and the consideration, weight, and application thereof stated. (See opinion.)

18. SAME—QUESTIONS OF FACT.

It is always a question of fact, to be determined by a jury, or by the court, if the case is tried without a jury, whether a vein or lode has been discovered or exists within the limits of the location in controversy, and also as to the continuity of ore and mineral matter constituting the length, width, and extent of any particular vein or lode.

19. REVIEW OF FACTS—CONCLUSIONS.

The facts of this case as to the character of the yellow porphyry rock wherein the vein matter is found, and the purple prophyry rock by which it is bounded, reviewed at length. *Held*, that the preponderance of the evidence shows that within this belt of yellow porphyry are numerous seams, crevices, fissures, and deposits where the quartz rock and decomposed rock and matter are found, containing mineral sufficiently diffused to justify miners in giving to the yellow porphyry the general designation of "mineralized matter,—metal-bearing rock."

20. PREVIOUS DISCOVERY OF A LODE—VALIDITY OF SUBSEQUENT LOCATION.

It is not necessary that the locator of a mining claim should be the first discoverer of a vein or lode, in order to make a valid location. It is sufficient if it be clearly shown that the locator knew at the time of making his location that there had been a discovery of a vein or lode within the limits of his location.

21. PRIORITY OF RIGHTS—NO QUESTION AS TO CROSS VEINS.

The West Justice and Blaine locations being prior in point of time, and the locators and owner thereof having complied with the mining laws, it necessarily follows that the location of the Peerless within the limits of said locations is entirely null and void, and no question as to its being a cross vein can be considered.

22. MINING CLAIMS—WHEN RELOCATION OF, CANNOT BE MADE.

Mining claims are not open to relocation until the rights of the former locator have come to an end. No relocator of a mining claim can avail himself of the mineral in the public land which another has discovered until the prior locator has in fact abandoned the ground, or, under the provisions of the mining law, has forfeited his right thereto.

23. SAME—RIGHTS OF LOCATORS TO OTHER VEINS THAN THOSE DISCOVERED.

Where a valid discovery and location of a vein is made, and the laws in relation thereto are fully complied with, the locator thereof is not only entitled to the vein or lode discovered by him, but every other vein or lode throughout its entire depth, the top or apex of which lies within the surface lines of his claim extended downward vertically, to which no right had attached in favor of other parties at the time his location was made.

(Syllabus by the Court.)

In Equity. Bill by W. H. Book and W. H. Blowey against the Justice Mining Company to quiet title to certain mining locations. Decree for defendant.

The following is a plat of the locations in question:

Robert M. Clarke, for complainants.
W. E. F. Deal, for defendant.

HAWLEY, District Judge. This is a suit in equity to quiet the title to certain mining ground situate on Justice hill, in the Gold Hill mining district, Storey county, Nev. Complainants are citizens of the United States, and claim title to the ground in controversy under the Peerless mining location made by them on September 22, 1892. Defendant is a corporation organized and existing under and by virtue of the laws of the state of California, and engaged in the business of mining in Storey county, Nev. It claims title to the ground under and by virtue of the mining locations known as the "West Justice" and "James G. Blaine." These claims were located

on the 2d day of January, 1888,—the West Justice, by Charles Lyons; and the James G. Blaine, by Dennis Harrington and Roger Sheehan. At the time these locations were made, Lyons, Harrington, and Sheehan were citizens of the United States, and were in the employ of the defendant at the Justice mining claim,—a patented location owned by defendant, adjoining the West Justice on the northeast side. These witnesses testify that the locations of the West Justice and James G. Blaine claims were made by them in their own names, for the sole use and benefit of the defendant, at its request and expense. On the 29th of November, 1892, they executed and delivered deeds conveying the ground to defendant. This suit was commenced December 5, 1892. The land in controversy is a part of the public domain, and is known and claimed as mineral land. The Peerless location is valid, if the ground was subject to location at the time it was made. The West Justice and James G. Blaine locations were made long prior in point of time to the Peerless, and, if the locators or owners thereof fully complied with all the essential requirements of the law, the defendant will, of course, be entitled to a decree in its favor.

Complainants contend that both of said locations were and are invalid, and that the defendant never acquired any title thereto. This contention is sought to be maintained upon several separate and distinct grounds, each of which is earnestly contested. The record presents a mass of conflicting testimony upon nearly every vital point in regard to the facts. This seems to be inevitable upon the trial of mining cases. Every judge and "every lawyer at all familiar with the trial of mining cases, where the question of the existence or nonexistence of a lode or vein is raised, understands the difficulty that is often—we might say always—encountered in the attempt to ascertain the facts. Practical miners, experts, and men of science are often examined as witnesses, and they frequently differ as much in their statement of facts as in their conclusions of judgment." Mining Co. v. Corcoran, 15 Nev. 153. The task of ascertaining the truth from such conflicting evidence is by no means an easy one. But, difficult as it is, there are judicial methods of investigation that lead with almost unerring certainty to a satisfactory solution of the disputed questions. Intermingled with the controversies as to the facts, the whole case bristles upon every side with sharp-pointed legal questions, involving the construction that has been, or ought to be, given to the various provisions of the mining laws of the United States; and, upon these questions, counsel, in their zeal on behalf of their clients, seem to differ as much as to what the law is as the witnesses do as to the facts.

Under the mining laws of the United States, no valid location of a mining claim can be made until the discovery of a vein or lode within the limits of the claim located. The location of a mining lode or vein is made by taking up a quantity of land in the form of a parallelogram, not exceeding 1,500 feet in length and 600 feet in width, 300 feet on each side of the middle of the vein at the surface. The location of this piece of land must be distinctly marked on the ground, so that its boundaries can be readily traced. When the

record of the location of a mining claim is required to be made, it should contain the names of the locators, the date of the location, and such a description of the claim located, by reference to some natural object or permanent monument, as will, with reasonable certainty, identify the claim. Not less than $100 worth of labor must be performed, or improvements made, on the claim during each year.

Did the locators and owner of the West Justice and James G. Blaine locations comply with these provisions of the United States statutes?

1. Were the locations marked upon the ground in such a manner that their boundaries could be readily traced?

It appears from testimony that is undisputed that the ground embraced in these locations had been long previous to January, 1888, located as mining ground by other parties. This fact was publicly known at the time these locations were made. The time for doing the necessary work on the previous locations expired on the morning of the 1st day of January, 1888, which was Sunday. About 1:30 o'clock on Monday morning, January 2, 1888, the ground being covered with snow two feet deep, Lyons, Harrington, and Sheehan went upon Justice hill with a bundle of stakes, 2x4 and 4 feet long, previously prepared, and posted one stake at each of the four corners of the claims, upon which stakes were letters or numbers designating the corner of the claim where the stakes were posted. At places where the stakes could not be driven into the ground through the snow, they built monuments of rock around the stakes to hold them in place. In March or April, 1888, the stakes were renewed at places where they were then missing. The locators at this time also placed a stake near the middle of the southerly or southeasterly end line of the West Justice claim, so as not to encroach upon the Hartford patented claim. Lyons and Harrington testify positively to these facts, and explain with tedious minuteness almost each and every step taken and act done by them,—the preparing of the stakes, driving them into the ground, building of stone monuments, measuring the ground with a tape line, placing of written notices on the ground, etc. Upon cross-examination, one of these witnesses testified that the locators of the claims were engaged in this work about 2½ hours. The testimony of these witnesses as to the work done in posting the stakes is not disputed, except upon the imaginable theory that it is incredible that they could have performed the acts testified to by them within the time and in the manner testified to, owing to the fact that the night was dark and cold, the snow deep, and the hillside precipitous and rough. This argument is purely technical and critical, and is not based upon any merit whatever. It would, at most, only tend to establish—if it tends to establish anything—that the witness was mistaken as to the length of time it took to do the work. This may be admitted. But the fact remains that the work of posting the stakes was actually done. The testimony of defendant's witnesses upon this point is clear, positive, direct, and undisputed. Moreover, the stakes at the southeast corner of the West Justice, and at the end line

near the Hartford mine, were found standing, at the time the testimony was taken in this case, where they had been placed by the locators. The stake at the northeast corner of the West Justice was found lying upon the ground near the place where it had been posted. The stone monuments at the northeast corner of the Blaine and the northwest corner of the West Justice were still in place. It is not to be expected that all of the stakes and monuments would have remained in place, exposed as they were to the winds and rough weather, and liabilities of being torn down and destroyed by either innocent or evil-disposed people, for a period of four years. The fact is that, when the testimony in this case was taken, one of the stakes posted by complainants on the Peerless could not be found. It had disappeared within a few months after the location was made. Could it be claimed that the Peerless location is invalid on that account? Certainly not. Yet the contention of the complainants' counsel, if logically carried out, would apply with as much force to the Peerless as to the West Justice or Blaine locations. The only conclusion that is justified by the evidence is that the stakes and monuments were actually placed upon the corners of each of the locations made on January 2, 1888, and the conclusion is equally inevitable that the locations were so marked that the boundaries thereof could be readily traced. All the authorities agree that any marking on the ground, by stakes, monuments, mounds, and written notices, whereby the boundaries of the location can be readily traced, is sufficient. Gleeson v. Mining Co., 13 Nev. 442; Southern Cross Gold & Silver Min. Co. v. Europa Min. Co., 15 Nev. 383; North Noonday Min. Co. v. Orient Min. Co., 1 Fed. Rep. 523; Jupiter Min. Co. v. Bodie C. Min. Co., 11 Fed. Rep. 667; Hauswirth v. Butcher, 4 Mont. 308, 1 Pac. Rep. 714; Upton v. Larkin, 7 Mont. 449, 17 Pac. Rep. 728; Pollard v. Shively, 5 Colo. 309; Eilers v. Boatman, 3 Utah, 159, 2 Pac. Rep. 66; Du Prat v. James, 65 Cal. 555, 4 Pac. Rep. 562; Taylor v. Middleton, 67 Cal. 656, 8 Pac. Rep. 594.

The question as to the sufficiency of the stakes and monuments to enable the location to be traced always depends, to a great extent, upon the confirmation and condition of the ground located. A location on a hill covered by a dense forest might require more definite marking than a location on a bald mountain, where the stakes, wherever placed, could be readily seen. Justice hill slopes off in all directions. Purple and yellow porphyry rock is exposed upon the surface in many places, and can readily be seen without making excavations. On other portions of the hill, this rock is covered with loose soil from one inch to a foot or more deep. The whole surface of the hill is dotted over by small bunches of stunted sagebrush, and at and along the summit of the hill, as well as on the sides thereof, any stakes or monuments designating corners or lines of mining locations can readily be seen. No case has been called to my attention where the posting of stakes or building of monuments of the kind, character, and description testified to by the witnesses in this case, at the four corners of the location on the surface, upon a com-

paratively barren hillside, has not been deemed a sufficient compli ance with the law. The supreme court of this state has been ex tremely liberal in its views as to the manner in which mining loca tions might be marked upon the ground, and be sufficient to comply with the law. Gleeson v. Mining Co., supra. The law is certainly complied with whenever stakes and monuments are so placed upon the ground that the boundaries of the location can be traced with reasonable certainty, and without any practical difficulty. "The object of the law in requiring the location to be marked on the ground," as was said in the case last cited, "is to fix the claim,— to prevent floating or swinging,—so that those who in good faith are looking for unoccupied ground in the vicinity of previous loca tions may be enabled to ascertain exactly what has been appropri ated, in order to make their locations upon the residue. We con cede that the provisions of the law designed for the attainment of this object are most important and beneficent, and that they ought not to be frittered away by construction. But it must be remem bered that the law does not, in express terms, require the boundaries to be marked. It requires the location to be so marked that its boundaries can be readily traced. Stakes at the corners do not mark the boundaries. They are only a means by which the bounda ries may be traced;" but they are sufficient for that purpose. When the location is one sufficiently marked upon the surface, so that its boundaries can be readily traced, and all the other acts of location are performed as required by law, the right of possession becomes fully vested in the locator, and cannot be divested by the removal or obliteration of the stakes, monuments, marks, or notices, without the act or fault of the locator, during the time he con tinues to perform the necessary work upon the claim, and to comply with the law in all other essential respects. Jupiter Min. Co. v. Bodie C. Min. Co., 11 Fed. Rep. 667; McEvoy v. Hyman, 25 Fed. Rep. 598.

2. Were the notices and record of the West Justice and James G. Blaine defective, uncertain, or insufficient?

The notice of location of the West Justice reads as follows:

"Notice is hereby given that the undersigned has this 2d day of January, 1888, taken up and located fifteen hundred linear feet on this vein of gold and silver quartz, and three hundred feet on each side from the center thereof. This claim begins at this notice and monument, which is the southwest boun dary of the Justice Mining Company's claim, and extends fifteen hundred feet in a northerly course, thence six hundred feet in a westerly course, thence fifteen hundred feet in a southerly course, thence six hundred feet to the place of beginning. This claim lies north of the Hartford mine, Gold Hill mining district, Storey county, Nevada. This claim shall be known as the 'West Justice Mine.' Located this 2d day of January, A. D. 1888.

"Charles Lyons, Locator.

"Witness:
"Dennis Harrington.
"Roger Sheehan.

"Filed for record this 4th day of January, 1888, at 30 min. past 9 A. M., at request of locators.

"John Ross, County Recorder.
"Recorded Book D of Mining Locations, p. 81."

The language of the Blaine notice is similar, as to extent of ground claimed, etc. This claim is described as beginning at the southwest boundary of the West Justice, and it is stated that "this claim lies north of the Ennis mine," and that it shall be known as the "James G. Blaine Mine."

In determining the effect and sufficiency of these notices, it should be borne in mind that the mining laws of the United States do not require any notice to be posted upon the location of a mining claim, when it is made, and there is no provision, anywhere, requiring the notice to be posted in any particular place upon the ground. The locations were valid without any notice of location being placed on the ground. But it is argued that the locations are invalid because notices were posted that did not correctly describe the lode, and because the notices were not posted on the lode. In construing notices of this character, where, under the mining rules and local regulations, or state laws, such notices are required to be posted upon the ground, the courts are naturally inclined to be exceedingly liberal in their construction. Such notices are often drawn by practical miners, unaccustomed to legal forms and technical phraseology; hence, the language used in the notices is often subject to more or less criticism by counsel learned in the law, and engaged in preparing documents in legal shape and form. Then, again, locations are often made without any accurate knowledge of the true course and directions which a compass would readily give, and mistakes in the notice as to the direction and course of the ground located often occur. But such mistakes do not invalidate the location. Positive exactness in such matters should never be required. It is the marking of the location by posts and monuments that determines the particular ground located. Apply these principles to the notices in question. The Justice mining claim was a patented location, with well defined and marked boundaries, when the West Justice and Blaine were located. Now, the notice of location of the West Justice described it as commencing at the "southwest boundary of the Justice Mining Company's claim." If we were to be governed by the notice, there would be no difficulty in finding the commencement point, but it is said in the notice that the claim extends 1,500 feet in a northerly direction. This is a mistake, so far as the direction is concerned. True north would carry the line over and across the Justice mine, instead of along the southwesterly line of said patented claim, where the stake at the northeast corner of the West Justice was posted. The word "northerly," under such circumstances, conditions, and surroundings should not be interpreted as meaning due north. It includes and may mean any meridian line or course between a due north and northwest, and is defined and made certain by the posting of the stakes or the building of the monuments at the corners of the locations, or along the lines thereof. Such stakes and monuments would control the courses specified in the notice. Pollard v. Shively, 5 Colo. 309; Cullacott v. Mining Co., 8 Colo. 179, 6 Pac. Rep. 211;

McEvoy v. Hyman, 25 Fed. Rep. 596.    The mistakes made in the notices as to the courses of the lines are not, in the light of the other facts, sufficient to invalidate the locations.    Moreover, the West Justice is described in the notice as being north of the Hartford, which was a patented mining claim, well known and clearly defined.    This is held to be a sufficient compliance with the laws of the United States, which require that the record should contain such a description as will identify the claim by reference to some natural object or permanent monument.    Hammer v. Milling Co., 130 U. S. 292, 9 Sup. Ct. Rep. 548;  Upton v. Larkin, 7 Mont. 449, 17 Pac. Rep. 728;  Gamer v. Glenn, 8 Mont. 371, 20 Pac. Rep. 654.

The West Justice, notwithstanding the mistake in the notice as to the direction of its lines, was described and staked off in such a manner that it could easily be identified by any prospector or other persons who were desirous of ascertaining the boundaries of the particular ground that had been located.    In Metcalf v. Prescott, 10 Mont. 283, 25 Pac. Rep. 1037, the court held that an error in the notice, stating the location to be in a certain county, when in fact it was in another county, did not vitiate the description, otherwise good.

Further criticism is made as to the wording of the notices claiming 1,500 feet "on this vein," and to the fact that no vein was exposed where the notices were placed.    In some states there are laws requiring parties, when making a mining location, to sink a discovery shaft on the lode ten feet or more in depth, and to post a notice thereon, but there is no such law in this state. While the lode within the limits of the boundaries of the location is the principal thing that the locator desires to claim, the law does not demand a marking of the lode.    It is the surface land which is to be marked and described, and the notices must be read and interpreted with reference to this law.    What is here said disposes of the further objection specifically urged by counsel, that the notices were not placed within reasonable proximity to the lode.

All that has been said about the West Justice is equally applicable to the Blaine notice.    The various objections urged to the notices do not affect the validity of either location.

3. Was the annual assessment work done upon the West Justice and James G. Blaine locations?

The testimony shows that the defendant, in May, 1888, commenced work, running a tunnel from the Woodville shaft, at a point about 280 feet west of south from the Justice shaft, for the purpose of developing the vein or lodes contained in the West Justice and Blaine locations.    This tunnel was run over 200 feet in the year 1888, at an average expense of about $12 per foot.    It was extended in 1889 about 200 feet further, and in 1890, 1891, and 1892, about 100 feet each year.    It is 980 feet in length, and, according to the testimony of some of the witnesses, it cost the defendant over $20 per foot to run it.    It extends into the West

Justice ground over 200 feet beyond the line of the Justice claim. The sole object of running this tunnel, as testified to by defendant's witnesses, was to prospect the West Justice and Blaine locations. It also appears that another tunnel was run in the West Justice ground a distance of about 35 feet in 1889, at a cost of not less than $250, for the purpose of prospecting both the West Justice and Blaine locations. In 1890, another tunnel, commencing at the southwesterly line of the Justice, was run into the West Justice claim by the defendant, for a like purpose, at an expense that year of over $200. Work upon this tunnel was continued in the year 1891 at an expense of over $200, and in 1892 a like amount was expended in extending it. The testimony clearly shows that the running of these tunnels was a practical way to work and prospect the West Justice and Blaine locations. Labor and improvements, within the meaning of the statute, are deemed to be done on a mining claim or lode, whether it consists of one location or several locations, owned by the same party and contiguous to each other, when the labor is performed or improvements made for the purpose of working, prospecting, and developing the ground embraced in the location or locations. The running of a tunnel is often the best means of developing a lode or vein, and extracting the ore and mineral therefrom, and it is not of infrequent occurrence that such tunnels commence at the slope of a hill on the surface ground outside the surface location of a mining claim. When such work is done for the avowed and express purpose of prospecting two or more claims held in common, as was the case here, the courts have always held that such work was to be credited to such claims. This is always deemed to be a sufficient compliance with the provisions of the mining laws of the United States. Smelting Co. v. Kemp, 104 U. S. 636; Jackson v. Roby, 109 U. S. 440, 3 Sup. Ct. Rep. 301; Chambers v. Harrington, 111 U. S. 350, 4 Sup. Ct. Rep. 428. Work done outside of the limits of a claim, for the purpose of prospecting or developing it, is as available for holding the claim as if done within the boundaries of the claim itself. Mining Co. v. Callison, 5 Sawy. 440; Harrington v. Chambers, 3 Utah, 109, 1 Pac. Rep. 362; U. S. v. Mining Co., 24 Fed. Rep. 568. Section 2324 of the Revised Statutes is conclusive of this question. This section was amended February 11, 1875, "so that where a person or company has or may run a tunnel for the purpose of developing a lode or lodes, owned by said person or company, the money so expended in said tunnel shall be taken and considered as expended on said lode or lodes, whether located prior to or since the passage of said act; and such person or company shall not be required to perform work on the surface of said lode or lodes in order to hold the same as required by said act." In the light of this statute, and of the evidence in this case, the contention of complainants, that the Blaine location was invalid because no assessment work was done within the limits of the location, is shown to be absolutely untenable.

The next objection urged by complainants, upon this branch of the case, is that both the West Justice and Blaine locations are

invalid because the assessment work was not recorded· as required by the laws of this state.   The section of the law relied upon reads as follows:

"Sec. 2. Within thirty days after the performance of labor or making of improvements, required by law to be annually performed or made, upon any lode or mining claim, the person in whose behalf such labor was performed or improvements made, or some one in his behalf, shall make before, and record with, the mining recorder of the district wherein such claim is situated, an affidavit setting forth the amount of money expended, or value of labor performed or improvements made, or both, the character of expenditures, labor or improvements, a description of the claim or part of claim, affected by such expenditures, or labor or improvements, for what year, and the names of the owners or claimants of said claim, at whose expense the same was made or performed. Such affidavit, or a copy thereof, duly certified by the recorder, shall be prima facie evidence of the performance of such labor, or the making of such improvements, or both." St. Nev. 1887, p. 136.

The object of this act was evidently to fix some definite way in which the proof as to the performance of the work or expenses· incurred in the making of improvements might be, in many cases, more accessible.   In all mining communities there is liable to be some difficulty in finding the men who actually performed the labor or made the improvements, and procuring their testimony, in or- der to establish the facts necessary to show a compliance with· the mining law in this respect.   The act was passed, as expressed in the title, "for the better preservation of titles to mining claims." Locators of mining claims would doubtless often save much time and trouble, as well as hardship, inconvenience, and expense, by complying with the provisions of this act; but the act does not prevent, and was not intended to prohibit, the owner of a mining claim from making the necessary proof in any other manner, nor does it prohibit the contesting party from contradicting the facts stated in the affidavit.   It simply makes the record prima facie evidence of the facts therein stated.   In Coleman v. Curtis, (Mont.) 30 Pac. Rep. 266, the supreme court, referring to a statute of that state similar to the one here quoted, said that the statute "relates, not to the effect of doing the work or making the improvements, as required by law, but to the method of preserving prima facie evidence of the fact that such requirement has been fulfilled." See, also, McGinnis v. Egbert, 8 Colo. 41, 5 Pac. Rep. 652.   There is no provision in the statute to the effect that a failure to comply, with its terms will work a forfeiture, and the statute is not sus- ceptible of any such construction.   A forfeiture of a mining claim cannot be established except upon clear and convincing proof of the failure of the locators or owners of the claim to have the work done or improvements made to the amount required by law. Hammer v. Milling Co., 130 U. S. 292, 9 Sup. Ct. Rep. 548.

Objection is further made to the work done in this case upon the ground that the defendant is not in a position to avail itself of the proofs, because it is not shown that the locators did the work, and, further, because it affirmatively appears that the de- fendant did not have the legal title to the claims when the work, was done, and was not a resident of this state.   When a location is made by one person, in his own name, at the expense of, for

the benefit and on behalf of, another person, such other person is certainly entitled to the ground so located. There is no law which prohibits a citizen of the United States, who is a resident of another state, from taking up and locating mining claims in this state in his own name, or from employing citizens and residents of this state to locate claims in their own names for the benefit of such nonresidents. The defendant, it is true, is a foreign corporation. In the eye of the law, it is a resident of the state of California. Under the laws of this state, any nonresident person or corporation "may take, hold and enjoy any real property, or any interest in lands, tenements, or hereditaments within the state of Nevada, as fully, freely, and upon the same terms and conditions as any resident, citizen, person, or domestic corporation." Gen. St. § 2655. Another statute of this state provides that all corporations formed under the laws of Nevada for the purpose of mining "shall have power to purchase and hold such mining property as they may deem meet." Gen. St. § 279.

The statute of frauds, (Gen. St. Nev. § 2624,) relied upon by complainants, has no application whatever to the facts of this case. An oral agreement to locate a mining claim for the benefit of another need not be in writing. If a party, in pursuance of such an understanding, at the expense of another, locates the claim in his own name, he holds the legal title to the ground in trust for the benefit of the party for whom the location was made; and such party could, upon making the necessary proofs, compel the locator of the mining claim to convey the title thereof to him, although the agreement so to do was not in writing. This familiar principle has been often applied in cases where a party has entered into an oral agreement to locate mining ground for the joint benefit of himself and others, and makes a location in his own name. It has always been held that such oral agreements are not within the statute of frauds. Gore v. McBrayer, 18 Cal. 582; Moritz v. Lavelle, 77 Cal. 10, 18 Pac. Rep. 803; Hirbour v. Reeding, 3 Mont. 13; Welland v. Huber, 8 Nev. 203.

But in any event this question only affects the parties to the agreement, and it is difficult to see how strangers to the transaction could urge the statute of frauds, when the parties in interest had fully and voluntarily complied with their agreement by conveying the title to the party for whose benefit the locations were made. The statement is made in complainants' brief that:

"The truth is, defendant hunted up and purchased the pretended title of Harrington and Sheehan after the Peerless lode was discovered, and, by means of this title, is attempting to deprive complainants of their mine by means of the false pretenses that the location was made for the Justice Company, and that work done by the Justice Company in its workings was intended for the Blaine location."

The record does not bear out this assertion. It shows the truth to be, as before stated, that the locations were made for the benefit of defendant, that the work in running the tunnels was done at the expense of defendant, that the sole object and only purpose of running the tunnels was to develop the mining lodes and

veins within the limits of the West Justice and Blaine locations, and that such object and purpose were publicly made known at the time the work was done.

4. Did the locators of the West Justice and James G. Blaine discover any vein or lode of quartz or other rock in place, bearing gold or silver, within the limits of their locations, prior to the location of the Peerless claim? This is the most important question in this case. It is one upon which fair-minded men might honestly differ. Credible witnesses, of equal knowledge, character, experience, and judgment, have honestly expressed a difference of opinion in regard to it. It now devolves upon the court, without the aid of a jury, or the presence of the witnesses, to determine where, and upon which side, the weight of the evidence is found.

What constitutes a discovery of a vein or lode, within the meaning of the statute? Section 2320, Rev. St., provides that—

"Mining claims upon veins or lodes of quartz or other rock in place bearing gold, silver, cinnabar, lead, tin, copper, or other valuable deposits, heretofore located, shall be governed as to length along the vein or lode by the customs, regulations and laws in force at the date of their location. A mining claim located after the tenth day of May, 1872, whether located by one or more persons, may equal, but shall not exceed, 1,500 feet in length along the vein or lode; but no location of a mining claim shall be made until the discovery of the vein or lode within the limits of the claim located."

The words "vein or lode," in the last clause of this statute, were evidently intended to apply to such "veins or lodes" as were described in the first section, and to have the same meaning, viz. a vein or lode "of quartz or other rock in place bearing gold, silver," etc. This statute was intended to be liberal and broad enough to apply to any kind of a lode or vein of quartz or other rock bearing mineral, in whatever kind, character, or formation the mineral might be found. It should be so construed as to protect locators of mining claims, who have discovered rock in place, bearing any of the precious metals named therein, sufficient to justify the locators in expending their time and money in prospecting and developing the ground located. It must be borne in mind that the veins and lodes are not always of the same character. In some mining districts the veins, lodes, and ore deposits are so well and clearly defined as to avoid any questions being raised. In other localities the mineral is found in seams, narrow crevices, cracks, or fissures in the earth, the precise extent and character of which cannot be fully ascertained until expensive explorations are made, and the continuity of the ore and existence of the rock in place, bearing mineral, is established. It never was intended that the locator of a mining claim must determine all these facts before he would be entitled, under the law, to make a valid location. Every vein or lode is liable to have barren spots and narrow places, as well as rich chimneys and pay chutes, or large deposits of valuable ore. When the locator finds rock in place, containing mineral, he has made a discovery, within the meaning of the statute, whether the rock or earth is rich or poor, whether it assays high or low. It is the finding of the mineral in the rock in place, as distinguished from float rock, that

constitutes the discovery, and warrants the prospector in making a location of a mining claim.

Numerous references have been made by the respective counsel to the works of scientists as to the origin of ore deposits, the character of mineral formations, and the causes thereof. Le Conte's Elements of Geology, 205, 207, 220, 225, 228, 235, 236; Phillips on Ore Deposits, 18, 19, 32, 35, 74, 76 et seq.; Von Cotta's Treatise on Ore Deposits, 26, 27, 34, 35, 69, 70,—which have been examined. Various courts have at different times given a definition of what constitutes a vein or lode, within the meaning of the act of congress; but the definitions that have been given, as a general rule, apply to the peculiar character and formation of the ore deposits or vein matter, and of the country rock, in the particular district where the claims are located. There is no conflict in the decisions; but the result is that some definitions have been given in some of the states that are not deemed applicable to the conditions and surroundings of mining districts in other states, or other districts in the same state. The following cases are instructive upon the point, and are here cited. Some of them will be more particularly noticed after the facts of this case are reviewed. Mining Co. v. Corcoran, 15 Nev. 147; Eureka Consolidated Min. Co. v. Richmond Min. Co., 4 Sawy. 302; Mining Co. v. Callison, 5 Sawy. 439; Jupiter Min. Co. v. Bodie C. Min. Co., 7 Sawy. 97, 11 Fed. Rep. 666; North Noonday Min. Co. v. Orient Min. Co., 1 Fed. Rep. 522; Hyman v. Wheeler, 29 Fed. Rep. 347; Doe v. Mining Co., 54 Fed. Rep. 935; Mining Co. v. Cheesman, 116 U. S. 536, 6 Sup. Ct. Rep. 481; Burke v. McDonald, (Idaho,) 29 Pac. Rep. 98; Upton v. Larkin, 7 Mont. 449, 17 Pac. Rep. 728; Mining Co. v. Mahler, 4 Mor. Min. R. 390; Duggan v. Davey (Dak.) 26 N. W. Rep. 899; Harrington v. Chambers, 3 Utah, 115, 1 Pac. Rep. 362; Armstrong v. Lower, 6 Colo. 393, 581.

What are the facts of this case? The testimony on the part of the complainants is to the effect that the Peerless is a fissure having a regular course in an easterly and westerly direction, from a foot to three feet in width; a crevice in the earth and porphyry rock filled with decomposed quartz and clay; a quartz vein containing gold and silver in valuable quantities; a blind lode having a foot and hanging wall of porphyry rock, well defined. Upon the part of the defendant, Lyons testified that the northwestern part of the West Justice ground had been worked by miners in 1878 and 1879; that he knew that gold and silver bearing rock and earth had been taken out of the cuts that had been made by the miners, who at that time were working upon and claimed the same as mining ground; that prior to making the West Justice location he knew that there was a lode within the boundaries of that location containing gold and silver bearing rock and ore. He described the places where the old workings were, and the open cuts which still exist upon the surface of the ground. He further testified that in 1882, when he was foreman of the Justice mine, he let a contract to four men, and that they took out from the open cuts about $800 in

gold and silver ore. Other witnesses corroborate his testimony. Harrington testified that before making the Blaine location he was all over the ground, and examined it closely; that he discovered and found quartz rock in place, bearing mineral, within the limits of the Blaine location; that he found holes that had been sunk seven or eight feet long and six feet deep and three or four feet in width in the ground, in which was quartz rock in place; that there were several holes sunk down below the surface in solid rock, in which streaks of quartz and porphyry were found; and that he saw in some of these holes streaks of quartz a foot wide. Other witnesses corroborated this testimony.

After the commencement of this suit, numerous holes were dug at the instance and expense of defendant, commencing at the northwesterly end of the West Justice, and extending in places to the southwesterly line of the Blaine location, and at other places, over the hill, within the lines of the respective claims. The witnesses who performed this work testify that they traced the yellow porphyry rock all the way from the northerly end of the West Justice to the southwest corner of the Blaine claim; that, whenever they dug holes in the yellow porphyry rock formation, they obtained quartz rock and decomposed matter containing gold and silver, as shown by assays that were made. The testimony of other witnesses is to the effect that the purple prophyry rock constitutes the foot wall of the Blaine lode; that it forms the separation designated on defendant's Map E as the "Great Blaine Horse;" that it also forms the hanging wall of the Blaine lode; that there is a lode formation all the way. between the foot and hanging walls, broken only by the Blaine horse. Several practical miners, having no interest in this controversy, testified that from an examination of the old cuts, the Peerless shaft, and the several holes that were sunk by defendant to determine the formation and character of the ground, with knowledge of the fact that samples of the rock and decomposed matter taken therefrom assayed from $1 to $3 and $4, and at one place as high as $20, a ton, and in the old cuts over $100 a ton, they would say that the whole formation of yellow porphyry, as marked on Map E, from the foot wall to the hanging wall of the Blaine lode, is one single, mineralized formation, containing gold and silver bearing quartz rock in place, and constitutes what is known by miners as a "lode;" that there is no difference in the formation where the Peerless shaft is sunk from any other part of the lode where the same decomposed yellow rock with quartz is found; that the ore and vein matter, wherever found upon the hill within the limits of the West Justice and Blaine locations, is of the same kind and character; and that the Peerless is a mere seam or fissure in this formation, the boundaries of which are marked by the purple rock as the hanging wall and foot wall of the Blaine lode.

The conditions which defendant's witnesses testify to in relation to the yellow porphyry rock constituting a lode are denied by the complainants' witnesses in rebuttal. It is also denied by them that the yellow porphyry occurs upon the hill as represented on defend-

ant's Map E. They testify that the purple and yellow porphyry rock is found indiscriminately, in patches and spots, all over the hill, except at the Peerless fissure. The principal expert witness on the part of complainants testified that the rock, yellow and blue, constituting the mass on Justice hill, and particularly of the ground embraced in the locations in controversy, is what is known to geologists and mineralogists as "quartz porphyry;" that the difference in the appearance of the rock is a difference in color, and not of texture; that "the parts which outcrop above the surface, with very few exceptions, are purple in color, with quite a pronounced purple tinge, and the parts which are below the surface, or just at the surface, change gradually from the purple color of the outcropping rock to a bluish color just at the surface; and within a foot or two of the surface, below it, it changes into a reddish or yellowish color. These changes have no dividing line, or anything like that, but are imperceptible, and blending one with the other, the purple color decreasing gradually. The first is bluish, and then bluish and gray yellow, and then yellow." Great reliance is placed upon the testimony of this witness. His testimony is given from information obtained by reading elementary works on mineralogy and geology, and is to the effect that the yellow porphyry is not a lode, and that all the land on Justice hill, except that part embraced in the Peerless location, should be classed as agricultural, not mineral, land. This witness testifies to theories of his own, and states the facts which he claims substantiates his theories. The value of testimony of this character, in controversies of this kind, depends to a great extent upon the strength or weakness of the reasons given in support of the conclusions reached. Just what this witness meant will perhaps be best understood by quoting a few of the many questions and answers upon his cross-examination, as to what he considered was a lode or vein:

"Question. Excluding all the excavations that you have testified about within the boundary lines of the West Justice, Blaine, and Peerless claims, which are laid down upon the maps of the plaintiffs and defendant, what difference, if any, is there presented to the eye between any of the claims? Answer. Over the surface of the West Justice and Blaine claims there is but little difference in the surface appearance, excluding the excavations. I think the surface of the hill is very much the same, outside of the croppings of the rocks. Q. And you have included in that answer all the land embraced within the West Justice, James G. Blaine, and Peerless locations, and including the Peerless location inside of the Blaine? A. Yes, sir. Q. If, as a matter of fact, you had, upon taking samples, and having assays made, and making them yourself, —you had ascertained that that formation contained gold and silver, would you say that that formation constituted a lode? A. I would not, unless it contained gold and silver in sufficient quantities to make it valuable for mining purposes. Q. In ascertaining that fact, would you deduct from the value the actual cost of mining, the actual cost of labor, the actual cost of milling, and the actual cost of all the material used in mining the ore up to the time that the result of the working of your ore had been obtained, leaving a profit for yourself? A. I might. Probably, that would be the proper course to pursue. Q. In your judgment, before you would call that country about which you have testified a lode, would it be necessary for you to find the precious metals of gold and silver in sufficient quantities to pay all the expenses incident to mining, hauling, reduction, etc., and leave a profit besides? A. I would expect it to pay through-

out the extent of the rock, over and above expenses. Q. And, until that result was obtained, you would not call it a lode? A. I would not say it was a lode unless I found the metals in it to pay the cost of mining. * * * I would not call it a lode unless it was sufficiently mineralized to make it pay to work, or else it would be subject to location as agricultural land. *. * * Q. Suppose you found a homogeneous formation between defined boundaries, and upon investigation you ascertained the precious metals did not exist in sufficient quantities to pay for mining. Would you say it was a lode? A. I would reject it as a lode. The water of the ocean contains more gold and silver, in proportion, than the rocks of that hill; and yet I don't claim that the ocean is a lode, simply for the reason that it contains more gold and silver than that hill. But it is a fact that the water of the ocean contains more gold and silver, in proportion, than the rocks of the hill in question. * * * Q. Assuming as a fact that the cost of reduction is $5 or $6 a ton, and that the cost of labor is $4 a day, would you not say that the ground embraced in the locations named was not a lode unless gold and silver existed in sufficient quantities to cover at least those expenses? A. I would not say it was a lode unless it produced it in much greater quantity than that. * * * Q. Is it your understanding that, before a man can locate and acquire title to mineral land, he must actually develop a property that will pay the expenses I have named? A. Yes, sir; he has no right to make a location until he traces or develops such a lode by means of a tunnel, shaft, or other workings."

It must be remembered that this is not a controversy between miners, upon one side, and agricultural claimants, on the other, to determine whether the land on Justice hill is more valuable for one purpose than the other; but it is a controversy between miners, to determine which has the title to certain land claimed by both parties as mineral land, and to have the title thereto quieted by a decree of this court. The answers of the witness to the questions asked constitute the keynote to the theory relied upon by complainants to prove that no discovery of a vein or lode had been made within the limits of the West Justice and Blaine locations prior to the location of the Peerless lode. Other witnesses upon the part of the complainants defined what they understood to be a lode substantially to the same effect. If this theory were adopted by the courts, it would invalidate many mining locations. Logically carried out, it would prohibit a miner from making any valid location until he had fully demonstrated that the vein or lode of quartz or other rock in place, bearing gold or silver, which he had discovered, would pay all the expenses of removing, extracting, crushing, and reducing the ore, and leave a profit to the owner. If this view should be sustained, it is manifest that it would lead to absurd, injurious, and unjust results, destructive of the rights of prospectors and miners, in their honest, patient, and industrious efforts to explore, discover, and develop the veins and lodes that exist in the public mineral lands of the United States. A vein or lode of quartz or other rock in place, bearing gold and silver, is found upon the side of a hill or mountain. It is within well-defined walls, and the rock assays from $1 to $15 per ton. The cost of extracting, removing, and milling the ore is $20 per ton. The miner making the discovery is aware of this fact, but he knows, or has good reason to believe from his own knowledge, gained by years of experience, that, within or along the veins or lodes of that particular district, places are liable to

be found that may prove to be of much greater value, and that the ore is liable to be richer at ·a greater depth than it is upon the surface.   Now, in such a case, can it be reasonably claimed, under the provisions of the mining laws, that the person making the discovery—a discovery which, in good faith, induces him to locate the vein or lode, and to commence the running of a tunnel into the hill or mountain for the purpose of properly working and developing the ground, and complying with all of the provisions of the law, after he has expended thousands of dollars in labor and im- provements upon the same—can be deprived of his location by the fact that other persons, subsequent to his discovery and to his location, went upon the hill 500 or 1,000 feet distant from the place where he had found and prospected the lode, but within the limits of his location, and there, by sinking a· deeper shaft upon the same lode, found ore which assayed over $40 per ton,—enough to insure a profit to the owners,—and thereupon located the ground?   This may be an extreme case, but it fairly illustrates the theory, for, according to the testimony of some of complainants' witnesses, the latter location would be valid, and the prior loca- tion invalid.   The act of congress is not susceptible of any such construction.   It does not impose any conditions as to the value or extent of the ore.   It simply provides that "no location of a mining claim shall be made until the discovery of a vein or lode within the limits of the claim located."

Judge Sawyer, in construing this provision of the statute, cor- rectly instructed the jury in Jupiter Min. Co. v. Bodie C. Min. Co., 11 Fed. Rep. 675, that:

"A vein or lode authorized to be located is a seam or fissure in the earth's crust filled with quartz, or with some other kind of rock, in place, carrying gold, silver, or other valuable mineral deposits named in the statute. It is not enough to discover detached pieces of quartz, or mere bunches of quartz not in place. The vein, however, may be very thin, and it may be many feet thick, or thin in places,—almost or quite "pinched out," in miners' phrase,—and in other places widening out into extensive bodies of ore. So, also, in places, it may be quite or nearly barren, and at other places im- mensely rich. It is only necessary to discover a genuine mineral vein or lode, whether small or large, rich or poor, * * * within the lines of the claim located, to make a valid location including the vein or lode. It may, and often does, require much time and labor, and great expense, to develop a vein or lode, after discovery and location, sufficiently to determine whether there is a really valuable mine or not, and a location would be necessary, before incurring such expense in developing the vein, to secure to the miner the fruits of his labor and expense in case a rich mine should be developed."

In Eureka Consolidated Min. Co. v. Richmond Min. Co., supra, Mr. Justice Field, in delivering the opinion of the court, discussed this question as to what constituted a lode at great length, and came to the conclusion—

"That the term, as used in the acts of congress, is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock. It includes * * * all deposits of mineral matter found through a mineralized zone or belt, coming from the same source, im- pressed with the same forms, and appearing to have been created by the same processes."

This definition, where applicable to the facts, has been approved and followed, and is recognized and declared to be correct by the supreme court of the United States in Mining Co. v. Cheesman, supra, where the court said:

"A body of mineral or mineral-bearing rock, in the general mass of the mountain, so far as it may continue unbroken, and without interruption, may be regarded as a lode, whatever the boundaries may be. * * * With well-defined boundaries, very slight evidence of ore within such boundaries will prove the existence of a lode."

Hyman v. Wheeler, supra, is to the same effect.

In Burke v. McDonald, supra, the court held that:

"A lode, within the meaning of the statute, is whatever the miner could follow, and find ore. Under the requirements of the law, a valid location of a mining claim may be made whenever the prospector has discovered such indications of mineral that he is willing to spend his time and money in following with the expectation of finding ore; and a valid location of a mining claim may be made of a ledge deep in the ground, and appearing at the surface, not in the shape of ore, but in vein matter only."

In some mining districts the country rock is found in broken blocks scattered throughout the vein or mineralized rock constituting what is known and called the "lode." Where the lode or vein is wide, the country rock is occasionally found in large, solid bodies, extending for hundreds of feet in length, and several feet in width, forming what is technically known among miners as a "horse," and in other portions of the lode loose blocks or fragmentary bodies of the country rock will be found commingled, more or less, with the ore bodies of the vein or lode. Even in narrow veins there is liable to be an intrusion of the country rock into the vein, occupying almost its entire width, and sometimes leaving nothing but a narrow seam of clay leading the way for the miner to follow his vein until the country rock disappears, and the ore bodies are found continuing as before. Such conditions in the formation of the country rock, fissures, and ore bodies are often deceptive and misleading. The owners of such veins or lodes are often confronted with different theories, the truth or falsity of which can only be solved by expensive explorations. A practical illustration of these conditions is found in Phillips on Ore Deposits, p. 35, fig. 11, where the author, in referring to the conditions of the metalliferous veins found in the mining districts of Cornwall, England, says:

"The same lodes, within short distances, often vary considerably in direction, width, and dip, and they frequently split or divide into branches, both in length and in depth. These branches may, or may not, again unite. If, as in Fig. 11, a lode, a, incloses a mass of the country rock, the included fragment, b, is called a 'horse' or 'rider.'"

The definitions of a vein or lode, as given in the authorities, are, as before stated, instructive, and worthy of consideration. Their application to any given case must be determined by reference to the special facts which existed in the particular mining district where the lodes under consideration were located, in connection with the facts of the case before the court. It is always, in every case, a question of fact, to be determined by a court or jury, whether a vein

or lode has been discovered or exists within the limits of the particular claim or location in controversy, and also a question of fact as to the continuity of ore and mineral matter constituting the width and extent of any particular lode. In the case of Eureka Consolidated Min. Co. v. Richmond Min. Co., the court found the facts to be that a zone of limestone was contained within clearly-defined limits; that it bore unmistakable marks of originating, in all its parts, under the influence of the same creative forces; that it was bounded on the south by a wall of quartzite, and on the north by a belt of clay or shale; that the limestone was found between these limits, and had been broken up, crushed, disintegrated, and fissured in all directions, so as to destroy, to a great extent, all traces of stratification; that throughout this zone of limestone the mineral was found in the numerous fissures of the rock; that the mineral was "sufficiently diffused to justify giving to the limestone the general designation of mineralized matter,—metal-bearing rock." Substituting the words "yellow porphyry" for "limestone," and the words "purple porphyry" for "quartzite" and "clay or shale," and giving the true course of the hanging and foot walls, and we have substantially the same physical facts concerning the formation of the country on Justice hill as were found in the Eureka Case.

Several of the witnesses upon the part of the complainants, who expressed their opinion, as miners, that there was no vein or lode, except the Peerless, that had been discovered in the ground in controversy, testified upon cross-examination that the entire country from the north boundary of the West Justice and Blaine locations down to the Independent mine,—a distance of more than one mile,—is all of the same character; that mining claims are now, and have been for many years, located and worked in the same kind and character of formation as is found in the West Justice and Blaine locations; that it is just the kind of a country and formation that a prospector would look for and work in; that it is all a mineral belt, where a person is as liable to find ore in one place as in another; that the whole formation of yellow porphyry is more or less mineralized; and that, if the ground was not taken up, they would be inclined to locate it, with the expectation of finding ore that would pay expenses, and return a profit to the owner. Although there are found large blocks of solid, yellow porphyry rock containing no mineral, as is the case with the limestone, in limestone formations, yet in many places the yellow porphyry is broken, crushed, and decomposed, with seams and fissures found in all directions, showing more or less continuity of ore, quartz rock, and mineralized vein matter throughout the entire width of the yellow porphyry belt, giving to it a specific, individual character, and by which it can be distinctly identified, and is separated from the blue or purple porphyry by which it is bounded. Within this belt of yellow porphyry are numerous seams, crevices, fissures, and deposits where the quartz rock and decomposed earth and rock is found, containing mineral sufficiently diffused to justify miners in giving to the yellow porphyry the general designation of "mineralized matter,—metal-bearing rock."

Guided by the best lights at my command, the decisions of courts as to what constitutes a discovery, the definition of a "vein or lode," within the meaning of the act of congress, and the testimony contained in the record, I am of opinion that the weight of the evidence preponderates in favor of the defendant.

It is an undisputed fact that the locators of the West Justice and Blaine locations were not the original discoverers of the vein or lode, but it is not necessary that the locators should be the first discoverers of a lode, in order to make a valid location. It is sufficient if it is shown that the locators knew at the time of making their locations that there had been a discovery of a vein or lode within the limits of the locations made by them. Jupiter Min. Co. v. Bodie C. Min. Co., supra.

5. The facts of this case do not present any questions as to the rights of the parties under section 2336, Rev. St., with reference to cross veins, as contended for by complainants' counsel. The Peerless is not a cross vein, but it is a part of the Blaine lode, discovered and located within the limits of the Blaine location. Complainants, in making the location, and working upon the Peerless,—notwithstanding the fact that they may have acted in perfect good faith, under the honest belief that the land taken up by them was subject to location,—were trespassers upon the mining ground owned by defendant. It affirmatively appearing that the West Justice and Blaine locations were prior in point of time, and that the locators, and the owner thereof, have in every respect fully complied with the mining laws applicable to said locations, it necessarily follows that the Peerless location, or so much thereof as is within the limits of the West Justice and Blaine locations, is absolutely null and void, and no right or title to the ground in controversy was obtained thereunder. Mining claims are not open to relocation until the rights of the former locator have come to an end. No relocator can avail himself of the mineral in the public land, which another has discovered, until the former discoverer has in fact abandoned the claim, or, under the law, has forfeited his right thereto. As was said in Belk v. Meagher, 104 U. S. 284:

"The right of location upon the mineral lands of the United States is a privilege granted by congress, but it can only be exercised within the limits prescribed by the grant. A location can only be made where the law allows it to be done. Any attempt to go beyond that will be of no avail. Hence, a relocation on lands actually covered at the time by another valid and subsisting location is void; and this not only against the prior locator, but all the world, because the law allows no such thing to be done."

It is expressly provided in the act of congress that, where the locators of a mining claim have fully complied with all the provisions of the law, they—

"Shall have the exclusive right of possession and enjoyment of all the surface included within the lines of their locations, and of all veins, lodes and ledges throughout their entire depth the top or apex of which lies inside of such surface lines extended downward vertically." Rev. St. U. S. § 2322; Doe v. Mining Co., supra; Duggan v. Davey, supra; Mining Co. v. Fitzgerald, 4 Mor. Min. R. 380; Iron Silver Min. Co. v. Elgin Min. & Smelting Co., 118 U. S. 206, 6 Sup. Ct. Rep. 1177.

This is true in all cases, subject only to the other provisions of the statute, which have no application to this case, reserving to locators of other mining claims the right to follow under the surface of such locations for the purpose of extracting and removing the ore from any vein or lode, the top or apex of which lies within the surface lines of such other location.

It follows from the views herein expressed that the defendant is entitled to a decree in its favor. It is so ordered.