S. HAYES AND P. PHELAN, APPELLANTS, *v.* GIO-
VANNI LAVAGNINO, RESPONDENT.

1. *Mining Claim—Suit to Determine Right of Possession to—Findings of Fact—Amendment of.*

Where findings of fact are amended by the court while a motion for a new trial of the cause is pending, and the amendments are responsive to issues presented by the pleadings, and are supported by, and fair deductions from, the evidence, the action of the court in making the amendments will be regarded as authorized and justified.

2. *Mining Claim—Right of Possession—Location of—What Constitutes.*

In a suit to determine the right of possession of a mining claim, it is incumbent upon the locator to show, not only a location upon ground in due form of law, but also to show that the location was made upon a vein or lode of quartz or other rock in place, bearing mineral, with the discovery or knowledge on the part of the locator, before the location was made, of the existence of mineral there.

3. *Id.—Statutory Law—Vein Discovery.*

Under section 2320, Rev. St. U. S., the locator of a mining claim is not required to be the original discoverer of the vein or lode. If, at the time of making the location, there is the discovery of a vein or lode of quartz or other rock in place, and knowledge on the part of the locator of mineral there, the locator is entitled to make his location, even though the discovery was first made by some one other than the locator.

4. *Id.—Vein—Lode—Application of—Mineralized Matter.*

　　In practical mining, the terms "vein" and "lode" apply to all deposits of mineralized matter within any zone or belt of mineralized rock separated from the neighboring rock by well-defined boundaries, and the discoverer of such a deposit may locate it as a vein or lode. In this sense these terms were employed in the several acts of congress relating to mining locations.

5. *Statutory Construction—Deposit of Mineral Matter—Subject of Location.*

　　Under the acts of congress of July 26, 1866, and May 10, 1872, any deposit of mineral matter, or indication of a vein or lode, found in a mineralized zone or belt, within defined boundaries, which a person is willing to spend his time and money to follow, in expectation of finding ore, is the subject of a valid location; and, when metallic vein matter appears at the surface, a valid location of a ledge, deep in the ground, to which such vein matter leads, may be made.

6. *Statute of Limitations.*

　　A party who wishes to rely upon the statute of limitations in a suit to determine the right of possession of a mining claim must plead it.

(No 883. Decided July 26, 1898.)

Appeal from district court, Salt Lake county; Ogden Hiles, *Judge.*

Action by S. Hayes and another against Giovanni Lavagnino. Judgment for defendant, and plaintiffs appeal. *Reversed.*

*Frank Hoffman,* for appellants.

*S. H. Lewis,* for respondent.

BARTCH, J.:

This is an action to determine the adverse claims of the parties to the right of possession of certain mining ground

situate in West Mountain mining district, Salt Lake county, state of Utah. It is alleged in the complaint, in substance, that prior to January 1, 1893, the plaintiffs were, ever since have been, and now are, the owners (subject to the paramount title of the United States) in possession, and entitled to the possession, of the Gladstone mining claim, containing a lode of rock in place, bearing silver and other precious metals, situate in West Mountain mining district (the claim being particularly described in the complaint by metes and bounds); that the defendant, who claims to be the owner of the Montreal No. 1 mining claim, about November 10, 1895, wrongfully caused the same to be so surveyed as to overlap the Gladstone, and include a portion thereof (the portion included being also described by metes and bounds); that about July 3, 1896, the defendant made application for a patent for the Montreal No. 1 mining claim, as so surveyed, in the United States land office at Salt Lake City, and caused the register to give notice of the application as required by law; that in the application for patent the defendant wrongfully alleged that he was the owner and in possession of the whole of the Montreal No. 1 claim, including that portion of the Gladstone claim so wrongfully surveyed and overlapped; that the plaintiff within the proper time filed a protest and adverse claim in the land office for that portion of the Gladstone included in the Montreal No. 1 claim; that thereupon the proceedings on the application in the land office were stayed to await the determination by a court of competent jurisdiction of the right of possession of the disputed ground; and that, to determine the rights of the respective parties thereto, this suit was brought. After denying the allegations of the complaint in his answer, the defendant alleges ownership and right of possession to the disputed ground in himself, and avers.

that he located the Montreal No. 1 mining claim, according to law, about June 1, 1896, and fully performed the assessment work, and that the area in conflict is a part of the Montreal No. 1 claim. At the trial the court rendered judgment in favor of the defendant, and thereupon the plaintiffs appealed.

Counsel for the appellants insists that the court erred in rendering judgment in favor of the defendant, for the reason, among others, that under the additional facts found by the court the plaintiffs were entitled to judgment for the ground in controversy. The findings of fact, conclusions of law, and decree were filed May 13, 1897. The "additional findings of fact" were allowed and filed on June 21, 1897; and counsel for the respondent maintains that the court had no authority to make and file them after the findings of fact had been filed, and the decree entered. The additional findings, however, are responsive to issues presented in the pleadings, and were made and filed while a motion for a new trial was pending and before final action on that motion. They appear to be supported by the evidence, and are fair deductions therefrom. Under these circumstances, we are of the opinion that the court was authorized and justified in amending the findings of fact by making the additional findings. Did, then, these findings entitle the appellants to judgment for the ground in controversy? An affirmative answer to this question does not necessarily follow from the character of the findings, which read: "That on the—— day of January, 1882, said P. Phelan, who was then and there a citizen of the United States, posted a notice of location on a point on the Gladstone mining claim, marked, on the map used herein, 'Discovery,' and caused the same to be duly recorded in the mining recorder's office of the West Mountain mining district, Salt Lake

county, Utah territory.; that said location notice contained a sufficient description of the ground attempted to be located, with reference to natural objects and permanent monuments, as to sufficiently describe the same; that the description contained in said location notice is the same as that contained in plaintiff's complaint, and in plaintiff's protest on file in the United States land office. Second. That during each and every year after the posting and recording of said location notice, the plaintiffs in this action did and performed more than $100 worth of work and improvements on the ground described in said location notice. Third. I find that there was sufficient marking of the claim on the ground, by posts and monuments.as to identify the same." These findings show that on January 1, 1882, a notice of location was posted on the Gladstone claim at a point designated as "Discovery"; that the notice was duly recorded, and contained a sufficient description of the claim, respecting natural objects and permanent monuments; that such description is the same as that contained in the complaint herein, and protest filed in the land office; that during each year since 1882 more than $100 worth of work was performed in improvements on the claim; and that the claim was sufficiently marked on the ground by posts and monuments, to identify it. They do not show, however, as will be observed, that the location was made upon a vein or lode of quartz or other rock in place, bearing gold, silver, or other valuable deposit of mineral, in accordance with the laws of the United States; and therefore these findings, of themselves, do not entitle the appellants to judgment. It is incumbent upon them to show, in addition to what was so found, the existence of mineral at the point of their discovery, or in its immediate vicinity; that is, that the location was made upon a vein or lode of quartz or other

rock in place, bearing mineral, with the discovery or knowledge on the part of the locators, before the location was made, of the existence of mineral there. On the question of such discovery and knowledge respecting the existence of mineral, the court found as follows: "That the plaintiffs, or either of them, or their grantors, never at any time located the alleged Gladstone mining claim, for that they did not discover, nor had any one before the alleged location of this claim discovered, any vein or lode or rock in place, bearing minerals, within the limits of the claim located,"—and, in deciding the case, held that the evidence did not show an actual location of the premises by plaintiffs or their grantors or predecessors in interest. To determine whether the court erred in this finding and decision, as is maintained by the appellants, it becomes necessary to refer to the evidence respecting the nature of the material on which the location was made, and the discovery or knowledge on the part of the locators of the existence of metal at, or in the immediate locality of, the location.

It appears the ground constituting the Gladstone claim was first located in 1878, and work done in sinking the discovery shaft. Thereafter it was several times relocated, under different names, until in January, 1882, when it was located as the Gladstone claim. The parcel of ground thus located extends in a northeasterly and southwesterly direction; being bounded on the northeast by the Revere claim, and on the southwest by the Montreal. Referring to the history of the claim, counsel for the respondent, in his brief, said: "This fraction of ground now called the 'Gladstone' was first located in 1878. The shaft now used by the appellants for a discovery was then used as a discovery shaft by the then locators." It is thus conceded that the discovery shaft was sunk before 1882, and there-

fore whatever mineral strata or vein may be shown to ex-
ist there must have been discovered before the location of
the Gladstone; and it is but just and reasonable, under
the circumstances of this case, to infer that, if a mineral-
ized vein or lode was discovered by the sinking of that
shaft, its existence was known to the locators of the Glad-
stone before the location was made. If a vein or lode
actually exists at the point of their discovery, then such
discovery would seem to be a substantial compliance with
the provisions of section 2320, Rev. St. U. S., which reads,
"No location of a mining-claim shall be made until the
discovery of the vein or lode within the limits of the claim
located." This clause of the statute does not require that
the locator of the claim must be the original discoverer
of the vein or lode. If, then, in this case there was a dis-
covery of a vein, and knowledge on the part of the locators
of metal there, the locators were entitled to make their
location, even though the original discovery was made
by some one other than the locators. *Jupiter Min. Co.* v.
*Bodie Consol. Min. Co.*, 7 Sawy. 96, *Erhardt* v. *Boaro,*
113 U. S. 527. Does, then, the evidence show the
existence of a vein or lode, within the meaning of the
statute? On this point the witness Gibbons, who has
known that ground since 1880, testified: "I know what
was shown me as the discovery of the Gladstone. I ex-
amined it with a view of determining whether or not there
is a cropping of the vein there. There are indications of
a vein there. There is a shaft down there, and some
water in the bottom of it. The surface indications on the
other side of the shaft are mineralized. Q. Were they
such indications that a miner would follow in that dis-
trict, expecting to find a vein? A. Yes, sir. Q. Did you
ever see any ore taken from there, or any rock taken from
the surface? A. Yes, sir. Q. Is that the character of

the rock, or the outcropping on the surface, where this discovery was shown to be made? A. Yes, sir. Q. Would that indicate a mineral vein in that locality? A. Yes, sir; it would to me. Q. Is it such an outcropping or croppings that a miner would follow? A. Yes, sir; in my experience. Q. They lay on the surface, above the shaft? A. Yes, sir. Q. What was the nature and character of the ground upon which that shaft was sunk, as far as you could see it? A. Well, judging from looking at it, it would be oxidized like black rock. It would be quartzite. I didn't examine it very closely. It would be quartzite." The witness Legg, who was shown to be a mining superintendent of large experience, testified that he was acquainted with the Gladstone claim; that he had done work for the Lead Mining Company, of which he was superintendent, "upon the Revere, joined with the Gladstone interests, first under a joint lease,—the Revere holding a lease with the Gladstone in 1893;" and on cross-examination the witness said: "The tunnel that is spoken of in regard to developing the Gladstone was started in 1883. I followed what I presume was a vein. I called it that. Went down in the shaft 90 feet. Went down on the material that is within the walls. The vein was first 100 to 200 feet wide. Q. Where did you find that? A. Well, we found it anywhere along here—along the strike of the vein—for a distance of several thousand feet. During the period that I worked, I run the crosscut towards the hanging wall of the vein, and I think back, to make the connection with the works below. The total distance from the drifts was possibly 100 feet. When I made the connections, I went down to the lower workings. All this work below showed the apex on the Gladstone and on the Revere. The apex passes out of the end line of the Revere, and into the Gladstone. Q. Do you know what place it passes out? A.

Well, I presume that it would follow—taking it on the slope of the hill—that it would follow the entire distance. Q. How is that? A. Taking the width of the vein, it would possibly follow the entire distance between the side lines of the Revere. I don't know. It was never exactly defined on the surface on the wall. I have examined that closely, to some extent. This country here covers the apex,—the whole entire width of the claim; covers the apex of the vein. You must remember that the vein is very wide,—say, 150 feet. I haven't found it 250 feet wide. Coming down to nearly exact figures, I think the widest I have found it is 130 feet. The greater portion of the vein lies within the Revere ground, and passes into the Gladstone. There is no probability that the vein can pass or fall below the lower side line; that is, the easterly side line of the Revere. I have been over this ground a thousand times, I presume, and over the surface of the Gladstone. There is a vein passing through the point at the discovery of the Gladstone, that is a seam mineralized, that goes on and leads on down into the ore bodies below. It is what would be termed a 'vein.' It is one of the stringers or leaders from the vein. There is no porphyry dyke. There is overflow porphyry. There may be possibly overflown porphyry at the discovery. I didn't say it was a dyke. I said it was a feeder. It is mineralized strata. By the Court: What do you call a 'feeder?' The feeder running in the Gladstone? A. Into the ore that lies below the surface a small seam runs. You take the larger ore bodies below, and there are smaller seams of ore running over it to the vein matter. They are generally termed 'feeders.' Q. Where are these feeders,—in what claims? A. Well, you will find them in the Gladstone; also, in the Revere." There is other evidence of the

17 UTAH—13

plaintiffs tending to show metalliferous rock and matter within the limits of the Gladstone; and this evidence does not appear to be disputed by the defendant, except in a general way, by attempting to show that the surface of the Gladstone claim is covered with porphyry, and that the porphyry generally contains no ore.

Looking at the above, and other evidence in the record of like import, from a strictly scientific view it probably would not show the existence of a vein or lode within the limits of the claim. Geologists, when accurately speaking, apply the terms "vein" and "lode" to a fissure in the earth's crust filled with mineral matter. In Von Cotta's treatise on Ore Deposits (Prime's Translation, § 16), the author says: "Veins are aggregations of mineral matter in fissures of rocks. Lodes are therefore aggregations of mineral matter containing ores in fissures." Similar definitions have been given by Dana, Steele, and others. It will thus be noticed that, in the judgment of a geologist, a fissure or fracture in the earth's crust seems to be an essential element in the definition of either of these terms. If, therefore, the validity of a mining location, when assailed, were to be tested strictly by these definitions, it would doubtless be incumbent upon the locator to show that the location was made upon a fissure with well-defined walls on each side, and filled with metalliferous matter. That many mining claims, the locations of which have never been questioned, could not withstand such a test, cannot be doubted. The practical miner has paid little attention to scientific definitions of these terms. As to the term "lode," it has been said that the miners made the first definition, and that as used by them, before defined by any authority, it simply meant whatever they could follow, expecting to find ore,—that formation by

which a miner could be led or guided. This is implied by its derivation; the term being a variation of the verb "lead." The word "vein," with the miner, means practically the same thing. By him the two terms are used, interchangeably or together, to mean some formation within which, or following which, he can find ore, and outside of which he cannot expect to find it. The fissure, therefore, and its walls, are of importance, in the business of mining, only as defining the boundaries within which miners may reasonably expect to find ore. Doubtless, in practical mining the terms "vein" and "lode" apply to all deposits of mineralized matter within any zone or belt of mineralized rock separated from the neighboring rock by well-defined boundaries, and the discoverer of such a deposit may locate it as a vein or lode. We apprehend that the several acts of congress relating to mining locations were enacted for the protection of the miners, and that the terms "vein" and "lode" were employed in the sense in which they had used them, uncontrolled by scientific definitions. The act of July 26, 1866, provided for the procuring of a patent by any person or association of persons claiming a "vein or lode of quartz, or other rock in place, bearing gold, silver, cinnabar, or copper." The act of May 10, 1872, speaks of "veins or lodes of quartz or other rock in place, bearing gold, silver, cinnabar, lead, tin, copper," and other valuable deposits. No definitions of the terms "vein" and "lode" are given in either of the acts, and, from the fact that cinnabar and lead ores are included, it would seem that it was not the intention of the framers of the acts that purely scientific definitions should be applied in giving them effect; for it is not a characteristic of cinnabar that it is found in fissures of the earth's crust, or in veins or lodes as defined by geologists. It occurs generally in fibrous or amorphous masses bedded

in shales or slate rock. So lead is frequently found between strata in flat cavities, in beds within sandstones and rudimentary limestones,—formations which would not answer to veins or lodes, when speaking with scientific accuracy. A definition of "vein" or "lode" which would exclude any one of the metals mentioned would, with reference to those enactments, be defective; and its application, in interpretation, would not be in harmony with the spirit and intent manifest from contexts. Evidently those laws were not enacted in the interests of science, but for the purpose of protecting the rights of miners as to their mining claims located and developed, and therefore should be construed with such liberality as to effectuate that purpose, and protect miners as to their mining claims located upon any kind of vein or lode of quartz or other rock in place, bearing any of the metals named in the acts, regardless of the kind or character of rock or formation in which the mineral may have been found. The fact that the terms "vein" and "lode" have been used, by the legislators in connection with each other is suggestive that congress intended to avoid any limitation in the application of the acts which might be imposed by a scientific definition of either term. Mr. Justice Field, in the *Eureka Case*, 4 Sawy. 302, Fed. Cas. No. 4,548, after discussing the term "lode" as used in scientific works and in the acts of congress, said: "It is difficult to give any definition of the term, as understood and used in the acts of congress, which will not be subject to criticism. A fissure in the earth's crust, an opening in its rocks and strata made by some force of nature in which the mineral is deposited, would seem to be essential to the definition of a 'lode,' in the judgment of geologists. But to the practical miner the fissure and its walls are only of importance as indicating the boundaries within which he may look

for, and reasonably expect to find, the ore he seeks. A continuous body of mineralized rock lying within any other well-defined boundaries on the earth's surface, and under it, would equally constitute, in his eyes, a lode. We are of opinion, therefore, that the term, as used in the acts of congress, is applicable to any zone or belt of mineralized rock lying within boundaries clearly separating it from the neighboring rock." It would seem, from these considerations, that any deposit of mineral matter, or indication of a vein or lode, found in a mineralized zone or belt within defined boundaries, which a person is willing to spend his time and money to follow in expectation of finding ore, is the subject of a valid location, and that when metallic vein matter appears at the surface, a valid location of a ledge deep in the ground, to which such vein matter leads may be made. 1 Lindl. Mines, § 336; *Mining Co.* v. *Cheesman,* 116 U. S. 529; *Harrington* v. *Chambers,* 3 Utah 94; *Railway Co.* v. *Migeon,* 68 Fed. 811; *Burke* v. *McDonald* (Idaho), 29 Pac. 98; *Book* v. *Mining Co.,* 58 Fed. 106; *Stevens* v. *Williams,* 1, McCreary 480, Fed. Cas. No. 13,413; *Shreve* v. *Mining Co.,* 11 Mont. 309; *Chambers* v. *Harrington,* 4 Sup. Ct. 428; *Larkin* v. *Upton,* 144 U. S. 19. Looking at this case in the light of authority and of the principles discussed, we are unable to say that the finding in question and the decision of the court are warranted by the evidence.

As a new trial must be granted, it may be important to suggest that there is considerable evidence in the record which is indefinite, uncertain, and unintelligible; there being numerous mining claims contiguous to the Gladstone, as shown by the map, marked "Defendant's Exhibit 3" and the witnesses, in many of their statements, having used the words "here" and "there" without designating the claim to which they referred. Such state-

ments can be of no value in this court, and ought not to be permitted.

Counsel for the appellants, in his brief, also maintains that they were in possession of the Gladstone claim for a period longer than that of the statute of limitations, and for that reason were entitled to judgment against the respondent. In answer to this contention, it is sufficient to say that no such issue was raised in the pleadings.

A discussion of the other points raised in the record is not deemed important. The case is reversed, and the cause remanded, with directions to the court below to grant a new trial.

ZANE, C. J., and MINER, J., concur.