## DEBNEY et al. v. ILES et al.

(Third Division. Valdez. November 21, 1907.)

No. 128.

1. DISMISSAL AND NONSUIT (§ 81*)—SETTING ASIDE—JUDGMENT.

If no injury results to the defendant, the court will set aside a nonsuit, when it appears that the suit is meritorious, and the plaintiff has been surprised by some defect which he did not discover in time to remedy.

[Ed. Note.—For other cases, see Dismissal and Nonsuit, Cent. Dig. §§ 182–192; Dec. Dig. § 81.*]

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

**2. MINES AND MINERALS (§§ 25, 38*)—MINING RIGHTS—FORFEITURE—EVIDENCE.**

Forfeitures of mining rights are deemed odious in law. The evidence to establish such forfeitures must be clear and convincing. The burden of proving it is on him who asserts it.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 60, 101; Dec. Dig. §§ 25, 38.*]

**3. MINES AND MINERALS (§ 23*)—ANNUAL ASSESSMENT—FORFEITURE.**

Even though a miner fails to do a prior year's annual assessment work, if he subsequently enters and performs before the rights of others intervene, his right is deemed to have revived.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 59; Dec. Dig. § 23.*]

**4. MINES AND MINERALS (§ 23*)—ANNUAL ASSESSMENT—RULE.**

The test as to what will satisfy the statutory requirement of annual labor, which is usually applied, is as to whether it is such as will, in fact amount to an improvement of the claim, such as is calculated to develop it and facilitate the extraction of the valuable contents of the claim.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. §§ 51–54; Dec. Dig. § 23.*]

**5. MINES AND MINERALS (§ 17*)—APEX—DISCOVERY—LODE CLAIM.**

The apex of a vein is not necessarily a point, but often a line of great length. Any portion of the apex on the course or strike of the vein found within the limits of the claim is sufficient discovery to entitle the locator to obtain title. The vein beyond the end lines is subject to further discovery and appropriation. Hence the apex in its full width, with some portions of its length, might be found in each claim, and, so discovered, justify the discoverer in obtaining title to each.

[Ed. Note.—For other cases, see Mines and Minerals, Cent. Dig. § 24; Dec. Dig. § 17.*]

By this suit plaintiffs seek to quiet their title to two certain adjoining copper lode claims, the All-American lode mining claim No. 1 and All-American lode mining claim No. 2, in the

---

*See same topic & § NUMBER in Dec. & Am. Digs. Key No. Series & Rep'r Indexes

Valdez recording district, Alaska. The situs of these claims is Solomon Gulch, some four or five miles south from the point where Solomon Gulch creek enters Valdez Bay. Plaintiffs by their amended complaint set up their ownership in and possession of these two claims, dating such ownership and possession from March 19, 1904. The defendant Brown was not served and does not appear. The defendant Iles by his answer alleges that since July 24, 1901, he and his grantors have been the owners and in possession of a certain lode mining claim known as the King Solomon lode mining claim No. 1; that on September 15, 1905, he staked and located the Queen of Sheba lode mining claim, adjoining the latter on the westerly end; and that the land so located and now claimed as the Queen of Sheba lode was at the time of such location open and unappropriated mineral land of the United States. He denies that plaintiffs ever were the owners, or lawfully in possession, of the land in controversy. Plaintiffs in their reply admit the location of King Solomon lode No. 1 by H. E. Ellis, but allege that Ellis and his grantees abandoned that claim by failing and neglecting to perform the annual assessment work for the years 1902 and 1903. They also allege a failure to perform the 1904 and 1905 assessment work, and assert that the ground in controversy was open, unappropriated, public mineral land on March 19, 1904, when their grantor, C. G. Debney, made his alleged location. Iles' Queen of Sheba location they deny, alleging that at the time he claims to have made the location the land was neither open nor unappropriated, but, on the contrary, was occupied, claimed, and owned by them, by virtue of their locations made more than a year prior thereto. From the testimony in the case it appears that King Solomon lode No. 1 and All-American No. 1 are upon nearly identical ground, there being a strip at the east end of the King Solomon claim, extending from side line to side line of the claim, and about 10 feet

wide, that lies to the eastward of the east end line of All-American No. 1.

The facts of the case as they appear on the trial seem to be that on July 24, 1901, a prospector, H. E. Ellis, located on the ground now in controversy the copper lode mining claims King Solomon No. 1 and King Solomon No. 2. Claim No. 1 he subsequently quitclaimed to W. W. Gollin; but claim No. 2, which is nearly identical with the All-American No. 2, claimed by plaintiffs, and with the Queen of Sheba, claimed by defendant, he abandoned, performing no assessment work whatever upon it. Gollin retained the possession of the King Solomon No. 1 for some time; the record title remaining in him until September 22, 1905, when he executed a deed therefor to the defendant Iles. Iles, however, testifies, and this testimony stands uncontradicted, that in April, 1903, he purchased the claim from Gollin and entered into possession thereof. I am inclined to the opinion that the assessment work for 1902 was performed, it being clear that a shaft had been commenced, though it is not clear from the evidence as to who sank it. Certainly in May, 1902, when Iles first went upon the ground, a shaft was there. The real controversy in the case, however, is over the work for the year 1903. It appears that on April 5, 1903, the day following that upon which he purchased the King Solomon No. 1 from Gollin, Iles went upon the claim, accompanied by a negro named Jack Hayes. Hayes had come to Alaska with the defendant Iles early that spring, and prior to that time had been employed as a servitor in the defendant's family. He was not produced as a witness, nor does it appear that any effort has been made to secure his testimony in the case. The ground in the vicinity of the claim was covered with snow to such a depth that it was necessary to use snowshoes in reaching it. The shaft was filled with ice and snow. Hayes was set to work in the shaft, and Iles returned to Ft. Liscum, some four miles

distant, where he arranged for supplies and steel to enable Hayes to carry on the work of sinking after he had removed the ice and snow. These supplies Hayes got the next day. After arranging for supplies, Iles returned to Valdez at once.

Iles testifies that Hayes was employed on the claim in doing development work from that time until April 21st, and that he paid Hayes the sum of $142.75 for his labor on the claim. This testimony is uncorroborated, except by an affidavit of labor purporting to have been sworn to by Jacob T. Hayes, at Washington, D. C., on November. 4, 1905. The affidavit was received in evidence as Defendant's Exhibit F, and is as follows:

"Affidavit of Labor.

"United States of America, District of Columbia—ss.:

"Before me, William L. Tydings, a notary public in and for the District of Columbia, personally appeared Jacob T. Hayes, who deposes and says that during the year 1903 he performed at least one hundred dollars worth of labor and improvements upon the King Solomon copper mine No. 1, in Solomon Basin, near Valdez, Alaska, and that said expenditure was at the instance and for the benefit of Alfred B. Iles, the owner of said claim, on account of assessment work for the year ending Dec. 31, 1903.

"Jacob T. Hayes. [Seal.]

"Sworn to and subscribed before me this fourth day of November, 1905.

"[Seal.]                    William L. Tydings, Notary Public.
"My commission expires May 16, 1910."

It appears from Iles' testimony that Hayes returned to Valdez at least once after April 5th. On this occasion, which was on April 8th, Iles saw Hayes in town. This was the last and only time to which Iles testifies as having seen Hayes, though he asserts that on the 12th of April he received from Hayes a letter containing samples of ore, which was sent across from Ft. Liscum to Valdez. While the defendant asserts that Hayes was at the claim during all this time, and

that he paid him therefor, his evidence is entirely unsupport-
ed, except by the affidavit of labor, Exhibit F above. On the
other hand, it appears, from the testimony of two witnesses
called by the plaintiffs, that between the 8th and the 21st of
April Hayes was seen upon the trail many miles from Valdez.
The witness Pontius Magnusson, who was one of the pro-
prietors of Wortman's Roadhouse, located on the trail some
20 or more miles from Valdez, testified positively that Hayes
spent two days between April 5th and April 12th at his road-
house, and left there in company with Dave Weston, heading
for the Copper river, and that he had not returned up to
August 1st. The other witness, Stephens, met Hayes first
April 12th on the trail at a point some 70 miles from Valdez.
Hayes was traveling toward the Copper river. Stephens again
met Hayes at White's Roadhouse, at a trail station called
Terrill, more than 100 miles from Valdez on April 20th. At
this time Hayes and Weston were in company. While it is
true that these witnesses were both apparently unfriendly to
the defendant, nothing was adduced to impeach or contradict
the testimony of either. It also appears from the books of a
mercantile concern of Valdez, namely, Hemple & Dougherty,
that some time before 11 p. m. on April 6th Hayes bought on
the credit of the defendant certain articles of wearing apparel,
consisting of heavy socks, rubber and leather shoes, overalls,
and gloves. On the morning of April 9th, the day after Iles
saw Hayes in town, and after which he did not again see him
for some time, Weston, in whose company Hayes was later
seen on the trail, started for the interior with freight for the
defendant.

Nothing more was done on the ground in question by any
one until the following year. C. G. Debney, the husband of
the plaintiff Mary A. Debney, and the person through whom
defendants claim, testified that, on March 19, 1904, he, ac-
companied by the plaintiff John Cantlon went to the premises

in question, but that, as the snow was some 10 feet deep at the time, they merely posted a notice of location. This notice they fastened to the branches of a bush or tree. Debney asserts that when he returned to the claim on May 19th he found this notice of location lying upon the ground. It is, however, doubtful if Debney and Cantlon reached the point which Debney asserts they did. Two witnesses called by defendant testified that later in the summer, as they were passing up Solomon Gulch in company with Cantlon, the latter pointed out to them a clump of alders a mile and a half down the gulch from the claim, and admitted to them that it was upon these bushes and at that point that Debney and he had fastened the notice of location, and that the snow was so deep that they had mistaken the spot, thinking they were on the claims. This, however, is not material, since no rights intervened before May 19, 1904, when Debney actually went to the ground. At this time most of the snow had gone. He staked the two claims, to which the plaintiffs are asserting title, and posted the notices.

It appears that at this particular point the ledge outcrops for some distance, and that at or near the center of the outcrop, on the apex of the ledge, he placed a center post, on one side of which he posted the notice for the All-American No. 1, and on the other for the All-American No. 2, making the west end line of the All-American No. 1 the east end line of the All-American No. 2. This line crossed the vein or ledge at right angles and at about the middle of the outcrop; the exposed ledge extending into each claim. In the plaintiffs' case in chief, Debney testified to having made his discovery in the year 1901, when he went to the claim in company with the original locator, Ellis. This, however, was deemed by the court to be too remote, and, on defendants' motion, a nonsuit was granted, on the ground that no discovery had been proven. Immediately the court had ruled, plaintiffs moved

to reopen. This motion was granted, and further testimony was taken on the subject of discovery. From this testimony the fact appears that in May, 1904, after staking the claim, Debney took samples from the exposed ledge at points from 10 to 15 feet on each side of the center stakes—that is, along the outcrop for a distance of from 10 to 15 feet into each claim—and discovered mineralized rock in place in each claim. These he claimed as his discoveries. On this occasion Debney and his assistant uncovered the ledge for a distance of some 10 feet beyond the outcrop in each claim and performed some other development work. During the year 1905 plaintiffs and their grantors performed more than the requisite assessment work for that year.

In September, 1904, the defendant Iles again visited the ground, having, as he testified, previously learned that Debney had staked over the ground claimed by him. On this visit he examined Debney's stakes and notices, and returned to Valdez, where he at once purchased some 3,500 feet of lumber and employed the Copper River Draying Company to take it to the claim. The employés of the company started with the lumber, but were unable, because of the condition of the road or trail, to take it more than a portion of the distance from the beach to the claim. There it was unloaded, and was never placed upon the claim by the defendant or his agents or employés, though certain employés of the parties who held from plaintiffs an option upon the claims appropriated some of the lumber, took it to the ground, and used it in timbering their shaft. Iles did nothing more in the way of assessment work upon the claim for this year. In September, 1905, Iles and a man named Friend put in some 24 days' work upon the claim. During the time that he and Friend were on the ground, he made a discovery, staked the Queen of Sheba lode, and posted the notice. The east end of this claim adjoins the west end line of the King Solomon No. 1, and the ground included with-

in the lines is practically that within the boundaries of the All-American No. 2.

John A. Carson and Edmund Smith, for plaintiffs.

John P. Fay and O. P. Hubbard, for defendant Iles.

GUNNISON, District Judge.   At the conclusion of the trial, defendant moved to strike all the testimony of the plaintiffs introduced after the case had been reopened, and renewed their motion for nonsuit.   Defendant contends that under the Alaska Code an order of nonsuit dismisses the suit without prejudice, and that when the order of nonsuit is once granted the court cannot reopen the case; the plaintiffs having recourse only to their right to commence a new suit.   This contention they base upon sections 377 and 378, pt. 4, p. 227, Alaska Codes, where it is provided:

"A judgment dismissing an action may be given against the plaintiff in any of the cases specified in subdivision 1, 2 and 3, of section 237, except the last clause of subdivision 3.   Such judgment is a determination of the action, but shall not have the effect to bar another action for the same cause or any part thereof."

Section 378, on the same page, provides:

"Whenever upon the trial it is determined that the plaintiff is not entitled to the relief claimed, or any part thereof, a judgment shall have the effect to bar another action for the same cause, or any part thereof, unless such determination shall be on account of the failure of proof on the part of the plaintiff, in which case the court may, on the motion of such plaintiff, give such judgment, without prejudice to another action by the plaintiff for the same cause, or any part thereof."

The nonsuit in the case at bar was granted upon the failure of proof, and under section 378 just quoted.   It is, I think, a rule of law too well established to require the citation of authorities that the court has control over its judgments and decrees during the term at which they are made and en-

tered. Not only is that general rule applicable here, but Congress in enacting the Alaska Code of Civil Procedure, provided in section 93, p. 163:

"The court may likewise in its discretion, and upon such terms as may be just, at any time within one year after notice thereof, relieve a party from the judgment, order or other proceeding taken against him through his mistake, inadvertence, surprise or excusable neglect."

The words "may likewise," in the section just quoted, refer to the language of section 92, "The court may * * * in furtherance of justice" act as therein provided. Aside from the general rule already stated, the authority given in section 93 is, in my opinion, sufficient to warrant the court in reopening the case and allowing the plaintiffs to introduce such evidence as they might have on the question of their discovery, rather than to compel them to resort to a new suit and to the added expense incident thereto. In the case of Jackson v. Waldron (C. C.) 5 Fed. 245, it was held that:

"If no injury results to the defendant, the court will set aside the nonsuit, when it appears that the suit is meritorious, and the plaintiff has been surprised by some defect which he did not discover in time to remedy."

I am of the opinion, not only that no injury did result to the defendant by the reopening of the case, but that the order was, in the language of the statute, "in furtherance of justice." Both motions should be denied.

Plaintiffs contend that the defendant had abandoned the King Solomon No. 1 claim. Section 2324, Rev. St. U. S. (U. S. Comp. St. 1901, p. 1426), declares that:

"Upon a failure to comply with these conditions [that is, as to discovery, staking, etc.], the claim or mine upon which such failure occurs shall be open for relocation, in the same manner as if no location of the same had ever been made."

Courts are reluctant to enforce this penalty and have established the doctrine that forfeiture cannot be established,

except upon clear and convincing proof of the failure of the former owner to have work performed or improvements made to the amount required by law. Nor do they incline to the enforcement of this class of penalties, which are deemed to be odious in law. Book v. Justice, etc. (C. C.) 58 Fed. 106; Hammer v. Garfield, etc., 103 U. S. 291, 9 Sup. Ct. 548, 32 L. Ed. 964; 2 Lindley, § 645. It will thus appear that the burden of proving a forfeiture or abandonment is upon him who charges .it. Plaintiffs assert that no work was done in the year 1902. Their own rights, however, if any rights they had, were not established until the year 1904, and I think the true rule to be that, even though the original locator failed to perform the assessment work for a certain year, and yet in the ensuing year does perform the work required for that year, before the rights of another intervene, his right is deemed to have been revived. Belk v. Meagher, 104 U. S. 283, 26 L. Ed. 735. The defendant's right, therefore, is dependent upon the work which he claims to have done upon the claim in the year 1903. I am of the opinion, from a careful examination of the evidence, that the man Hayes was not upon the claim after the 8th of April, 1903, and, though the defendant paid him for the work which he claims to have been done, such payment cannot be counted, inasmuch as the payment did not go for the development of the claim. The test as to what will satisfy the statutory requirement of annual labor, which is usually applied, is as to whether it is such as will in fact amount to an improvement of the claim, such as is calculated to develop it and facilitate the extraction of the valuable contents of the claim. 1 Snyder on Mines, p. 458. Despite the disinclination of the courts to impose the penalty of forfeiture, the person claiming the benefit of assessment work is required to establish that which he asserts. The burden of proving the work to be beneficial is upon him. And, though the defendant paid Hayes the amount to which he

testified, he has in my opinion failed to establish that any work beneficial to the claim has been performed. The preponderance of the testimony seems to be that Hayes was in the interior of the country, and not where he is claimed to have been. There is no authority under the law for the proving of assessment work by labor affidavits, and I am of the opinion that such affidavits are not only unsatisfactory but exceedingly dangerous. It is, I think, clear from the testimony that the defendant failed to perform the requisite amount of labor on the claim in the year 1903, and that, on the 1st of January, 1904, the land became open, unoccupied public land, subject to relocation by any one who might comply with the provisions of the law on that subject.

This being so, it becomes necessary to examine plaintiffs' locations. It is, I think, equally clear that in March, 1904, Debney did not go upon the ground in question, and consequently no rights were established by him at that time. However, it is not contended that the defendant's rights were revived between the 19th of March and the 19th of May, when Debney again went upon the claim. The plaintiffs' rights depend upon the sufficiency of the acts of Debney on his visit in May. It would seem that, where a locator seeks to establish a relocation upon a claim which he asserts to have been abandoned, he should be held to a strict compliance with the requirements of the statute. It appears from the evidence that he first staked his claims, then put up his notices of location, and thereafter made his discoveries. Upon the trial the plaintiffs relied upon the discovery claimed by Debney in 1901; but this discovery I am satisfied is too remote. Mr. Snyder in his work on Mines (volume 1, p. 314), lays down the proposition that:

"It is not necessary that a discovery be made before staking, if there are no intervening rights, although it has been held that no rights can be acquired until actual discovery." Erhardt v. Boaro, 113 U. S. 527, 5 Sup. Ct. 560, 28 L. Ed. 1113.

3 A.R.—29

The order in which these acts of location took place is not essential, if no rights intervened. 1 Lindley, 396; Perigo v. Erwin (C. C.) 85 Fed. 904; same case, 93 Fed. 608, 35 C. C. A. 482; Cosmos v. The Grey Eagle, 112 Fed. 4, 50 C. C. A. 79. It was held in the case of Doe v. Waterloo, 70 Fed. 455, 17 C. C. A. 190, that the law is satisfied if the discovery is made within a reasonable time after taking possession for the purpose of inaugurating a claim. It is, of course, true that in relocating ground claimed to have been abandoned the relocator should be required to conform to the provisions of the statute in all strictness, and that the court should indulge in no presumptions in favor of the relocator. Let us, therefore, examine the evidence of the plaintiffs as to their discovery. The defendant contended that the plaintiffs located upon the apex, made their discovery there, and, therefore, are attempting a fraud upon the government by locating two claims upon one discovery. It was said in Book v. Justice Mining Co. (C. C.) 58 Fed. 106, that:

"Where a locator finds rock in place containing mineral, he has made a discovery within the meaning of the statute, whether the earth or rock is rich or poor, whether it assays high or low. It is the finding of mineral in the rock in place, as distinguished from float rock, that constitutes a discovery and warrants the prospector in making the location of a mining claim."

This discovery of mineral, it has been held, must be treated as an entirety, and as the proper basis for but one location. 1 Lindley, 613; Reynolds v. Pascoe, 24 Utah, 219, 66 Pac. 1064. Thus it will appear that the discovery must be actual, rather than theoretical. But the plaintiffs contend that in making this location a discovery was made in each claim; in other words, that the apex of the vein lay in each claim; while the defendant's contention is that the contiguous end lines of the claim bisect the apex, and that plaintiffs improperly attempt to take advantage of a discovery on this apex. The theory upon

which their objection is based is doubtless predicated upon the idea that the apex of the vein is the highest point of the vein. That idea is not, I believe, supported by the weight of authority. The definition of the apex of the vein, which is strongly supported by both reason and precedent, is that the apex is the top edge or surface of the vein along its strike, whether this be the outcrop or be blind. If this be the proper definition of the apex of a vein, and I am prone to believe that it is, then any number of claims may be located along the apex upon its strike, and the fact that plaintiffs have bisected the outcrop of the apex by the contiguous or identical end lines of these two claims does not invalidate their location, if they have made independent discoveries in each claim. Mr. Lindley (volume 1, p. 346) contends for the definition of the apex as stated above, and cites numerous authorities upon the subject. The Supreme Court of the United States, in the case of Larkin v. Upton, 144 U. S. 19–23, 12 Sup. Ct. 614, 36 L. Ed. 330, also supports this definition; the Court saying, in affirming the decision in the lower court, that:

"The apex of a vein is not necessarily a point, but often a line of great length. Any portion of the apex on the course or strike of the vein found within the limits of the claim is sufficient discovery to entitle the locator to obtain title. The vein beyond the end lines is subject to further discovery and appropriation. * * * Hence the apex in its full width, with some portions of its length, might be found in each claim, and, so discovered, justify the discoverer in obtaining title to each."

This theory is also adopted in the case of Hayes v. Lavagnino, 17 Utah, 185, 53 Pac. 1029. The testimony of the plaintiffs is to the effect, and stands uncontradicted, that Debney discovered rock in place along the apex of the vein where it outcropped within the boundaries of each claim. The discovery was not made in a discovery shaft which was bisected by the identical end lines, as was the case in Poplar Creek Consolidated Mining Co., 16 Land Dec. 1, which was cited by de-

fendant in support of his contention. Here the discovery is made within the bounds of each claim.

"Discovery of mineral elsewhere upon the claim, if adopted and taken as and for the discovery, will rescue the location from loss of title otherwise resulting from failure of discovery." 1 Snyder, p. 323.

See Tonopah & Salt Lake Mining Co. v. Tonopah Mining Co. (C. C.) 125 Fed. 414.

In my opinion, the discovery of plaintiffs was sufficient in each claim, and therefore, on May 19, 1904, and the subsequent days, plaintiffs' grantor made a valid location of the mining claims All-American No. 1 and All-American No. 2, and they were such when the defendant Iles purchased the lumber and attempted to send it to the claim. It is, I think, clear that Iles cannot claim the benefit of this lumber; for he did not succeed in bringing it to the claim itself, and where work is done outside of a claim, which a claimant asserts benefits his respective claims, the burden rests upon him to establish that fact. 2 Lindley, § 631; Justice Mining Co. v. Barclay (C. C.) 82 Fed. 554. Not only did he fail to establish the fact that the lumber was a benefit to the claim, but at that time intervening rights had attached to the ground, and, had he succeeded in taking the lumber upon the very ground itself, he could not claim the benefit of it. So, too, his work in the year 1905 was without avail, as plaintiffs' rights had already been established. It must follow that the location of the Queen of Sheba lode was void, as the ground upon which it was located was not then open.

Judgment should be entered for the plaintiffs.